**HOME BOX OFFICE, INC., Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

**Professional Baseball et al., Intervenors.**

**No. 75–1280.\***

United States Court of Appeals, District of Columbia Circuit.

Argued April 20, 1976.

Decided March 25, 1977.

Special Concurring Opinion filed May 20, 1977.

\* Consolidated with the following petitions in which the Federal Communications Commission is the Respondent: Metromedia, Inc., 75–1284; Home Box Office, Inc., 75–1342, 1358; Columbia Pictures Industries, Inc., 75–1430; United Artists Corp., 75–1496; Motion Picture Association of America, Inc., 75–1555; National Association of Broadcasters, 75–1785, 2131; American Broadcasting Companies, Inc., 75–1788, 2130; CBS, Inc., 75–1807, 2129; National Broadcasting Co., Inc., 75–1869, 2172.

Simon H. Rifkind, New York City, of the
bar of the Court of Appeals of New York,

*pro hac vice,* by special leave of court, with whom Stuart Robinowitz and Bruce S. Kaplan, New York City, Harry M. Plotkin, George H. Shapiro, Linda A. Cinciotta and Ronald A. Cass, Washington, D.C., and Susan P. Carr and Moses Silverman, New York City, were on the brief, for petitioner in Nos. 75–1280, 75–1342, and 75–1358.

Robert W. Coll, Washington, D.C., with whom James A. McKenna, Jr. and Steven A. Lerman, Washington, D.C., were on the brief, for petitioner in Nos. 75–1788 and 75–2130 and for intervenor American Broadcasting Companies, Inc. in Nos. 75–1280, 75–1284, 75–1342, 75–1430, 75–1496, 75–1555, and 75–1358; also argued for all broadcasters.

Arthur Scheiner, Washington, D.C., with whom Richard A. Solomon, Robert D. Hadl, and Richard A. Moore, Washington, D.C., were on the brief, for petitioners in No. 75–1430.

Gerald Meyer, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Lawrence S. Lesser, Arlington, Va., was on the brief, for petitioners in No. 75–1496.

Barry Grossman, Atty., Dept. of Justice, Washington, D.C., with whom Samuel R. Simon, Atty., Dept. of Justice, Washington, D.C., was on the brief, for respondent United States of America. Robert B. Nicholson, Atty., Dept. of Justice, Washington, D.C., entered an appearance for respondent United States of America in No. 75–1785. Lee I. Weintraub, Atty., Dept. of Justice, Washington, D.C., entered an appearance for respondent United States of America in No. 75–2172. Carl D. Lawson, Atty., Dept. of Justice, Washington, D.C., entered an appearance for respondent United States of America.

Daniel M. Armstrong, Associate Gen. Counsel, F. C. C., Washington, D.C., with whom Ashton R. Hardy, Gen. Counsel, and Jack David Smith, Counsel, F. C. C., and Frederick W. Finn, Counsel, Cable Television Bureau, Washington, D.C., were on the brief, for respondent F. C. C. Joseph A. Marino, Associate Gen. Counsel, F. C. C., Washington, D.C., at the time the record was filed, also entered an appearance for respondent F. C. C.

Curtis T. White, Washington, D.C., with whom Frank W. Lloyd, III, Washington, D.C., was on the brief, for intervenor National Citizens Committee for Broadcasting.

Thomas J. Dougherty and Preston R. Padden, Washington, D.C., were on the brief for petitioner in No. 75–1284.

John B. Summers and James J. Popham, Washington, D.C., were on the brief for petitioner in Nos. 75–1785 and 75–2131.

Sidney Schreiber and James Bouras, New York City, were on the brief for petitioner in No. 75–1555.

Joel Rosenbloom, Peter D. Bewley, Stephen A. Weiswasser, and Lowell B. Miller, Washington, D.C., were on the brief for petitioner in Nos. 75–1807 and 75–2129 and for intervenor CBS Inc. in Nos. 75–1280, 75–1284, and 75–1358. J. Roger Wollenberg, Washington, D.C., entered an appearance for petitioner in No. 75–1807.

Bernard G. Segal, Philadelphia, Pa., Corydon B. Dunham, New York City, and Howard Monderer, Washington, D.C., were on the brief for petitioner in Nos. 75–1869 and 75–2171.

Henry Geller, Washington, D.C., filed a brief as *amicus curiae* urging reversal in Nos. 75–1280, 75–1284, 75–1342, 75–1358, 75–1430, 75–1470, 75–1496, and 75–1555.

Kenneth A. Cox, William J. Byrnes, and Raymond C. Fay, Washington, D.C., filed a brief on behalf of American Mothers Committee, Inc., *et al.,* as amici curiae.

James F. Fitzpatrick and Frank G. Washington, Washington, D.C., were on the brief for intervenor Professional Baseball in Nos. 75–1280, 75–1284, 75–1358, 75–1430, and 75–1496.

James A. McKenna, Jr., Robert W. Coll, and Steven A. Lerman, Washington, D.C., entered appearances for intervenors Forward Communications Corporation, *et al.,* in Nos. 75–1280, 75–1284, 75–1358, 75–1430, 75–1496, and 75–1555.

Arthur Scheiner, Washington, D.C., entered an appearance for intervenor Twentieth Century-Fox Film Corp.

Before WRIGHT and MacKINNON, Circuit Judges, and WEIGEL,[*] District Judge.

## PER CURIAM:[1]

In these 15 cases, consolidated for purposes of argument and decision, petitioners challenge various facets of four orders of the Federal Communications Commission which, taken together, regulate and limit the program fare "cablecasters"[2] and "subscription broadcast television stations"[3] may offer to the public for a fee set on a per-program or per-channel basis.[4] Technically, the orders reviewed here amend previous, more stringent, Commission rules.[5] While this procedural nicety has not gone

[*] Of the United States District Court for the Northern District of California, sitting by designation pursuant to 28 U.S.C. § 292(d) (1970).

1. The opinion in this case is issued as a *per curiam*, not because it has received less than full consideration by the court, but because the complexity of the issues raised on appeal made it useful to share the effort required to draft this opinion among the members of the panel.

2. "Cablecasting" refers to the origination of programming on a cable television system, in contradistinction to the retransmission of signals that have been received over the air from conventional broadcast television stations. *See* 47 C.F.R. §§ 76.5(v)–(x) (1975). The rules challenged here apply to both "access" cablecasters, who lease (or are given) channel time from cable system operators, *id.* § 76.5(x), and "origination" cablecasters, who are system operators, *id.* § 76.5(w). *Id.* § 76.225. The rules challenged here apply only to cablecasting on systems which also carry broadcast signals. *See id.* §§ 76.5(a), 76.225. Although some petitioners have argued that the rules should be extended to all cablecasters, we think the Commission has given a rational basis for this distinction. *See First Report and Order*, 52 FCC 2d 1, 47–48 (1975), JA 71–72.

3. Subscription broadcast television stations are those with the technical capability to broadcast programs "intended to be received in intelligible form by members of the public only for a fee or charge." 47 C.F.R. § 73.641(b) (1975).

4. Jurisdiction over these petitions for review is based on 47 U.S.C. § 402 (1970) and 28 U.S.C. § 2342 (1970).

In addition to the four orders promulgating, modifying, or refusing to waive the "anti-siphoning" rules, petitioner Home Box Office, Inc. and *amicus* Henry Geller request that we order the Commission to complete its "program exclusivity" proceedings. "Program exclusivity" refers to an alleged broadcast network practice of obtaining exclusive exhibition rights against cablecasters. This problem was apparently first brought to the attention of the Commission in 1971 and it issued a notice of proposed rulemaking at that time. *See Notice of Proposed Rule Making*, 27 FCC 2d 13 (1971) (Docket 18179). No further action appears to have been taken in this docket. The issue was raised again in the proceeding here under review, Docket 19554. The issue was not decided in the *First Report and Order, supra* note 2. Instead, a "Notice of Inquiry" was issued, 52 FCC 2d 87 (1975), JA 111, establishing Docket 20402, a proceeding in which the issue was to be resolved. Almost 18 months have passed since issuance of this notice and over a year since the close of the comment period. Yet we are unaware that any action has been taken by the Commission. We agree with the Commission in Docket 19554 that the use of exclusivity clauses "raise[s] anti-trust questions," *Further Notice of Proposed Rule Making and Order for Oral Argument*, 48 FCC 2d 453, 462 n.16 (1974), JA 18. In view of this, and in view of the potentially deleterious effect of exclusivity on the interest of viewers in having the greatest possible access to diverse sources of information, we think the Commission should by now have terminated its deliberations. Therefore, we today enter an order "compel[ling] agency action * * * unreasonably delayed." 5 U.S.C. § 706(1) (1970).

5. In FCC Docket 18397 rules originally developed for application to subscription broadcast television were applied to pay cablecasting. 20 FCC 2d 201 (1969). Petitions for reconsideration of this order were filed with the Commission by many of the parties here. *See Notice of Proposed Rule Making and Memorandum Opinion and Order*, 35 FCC 2d 893, 894 n.5 (1972), JA 2. These petitions were denied. *Id.* at 899, JA 7. At the same time, however, the Commission instituted further rulemaking with regard to pay cablecasting under new Docket 19554. In *In re Home Box Office, Inc.*, 51 FCC 2d 317 (1975), JA 141, which is also on review here, the Commission took the view that the rules adopted as a result of the rulemaking in Docket 18397 were final and binding and would not be waived. *See* 51 FCC 2d at 321, JA 145. We disagree with this interpretation, however. *See* note 27 *infra*.

The subscription broadcast television rules were adopted by the Commission in Docket 11279, *see Fourth Report and Order*, 15 FCC 2d 466 (1968). These rules were affirmed by this court in *National Ass'n of Theatre Owners (NATO) v. FCC*, 136 U.S.App.D.C. 352, 420

unnoticed by those petitioners who attack only the amendments to the rules on the theory that they represent a major, but unexplained and hence arbitrary, change of prior Commission policy,[6] it has largely escaped those who take the opposing view that any regulation exceeds the authority of the Commission.[7] We accept neither view in full but instead uphold the orders

challenged here insofar as they relate to subscription broadcast television and vacate the orders as arbitrary, capricious, and unauthorized by law in all other respects.

## I. THE FACTUAL BACKGROUND

At the heart of these cases are the Commission's "pay cable" rules, set out in the margin for convenience.[8] The effect of

F.2d 194 (1969), *cert. denied*, 397 U.S. 922, 90 S.Ct. 914, 25 L.Ed.2d 102 (1970). Subsequently the Commission entertained petitions for amendment of its subscription television and pay cable rules as they related to sports. *Notice of Proposed Rule Making*, 35 Fed.Reg. 11040 (1970) (Docket 18893). One order was entered in this docket, *Report and Order*, 34 FCC 2d 271 (1972), which amended the subscription television sports rule. Petitions for reconsideration were filed in this proceeding, and consideration of these petitions was granted and consolidated with the further consideration of pay cable rules announced in Docket 19554. *See Notice of Proposed Rule Making and Memorandum Opinion and Order, supra*, 35 FCC 2d at 898, JA 6. The rules promulgated in the *First Report and Order, supra* note 2, constitute the Commission's decision on reconsideration of its earlier *Report and Order* in Docket 18893. The *First Report and Order* terminated Docket 18893. *See* 52 FCC 2d at 68, JA 92. Subsequently, however, the Commission issued its *Second Report and Order* in Docket 19554, —— FCC 2d ——, 35 P & F Radio Reg. 2d 767 (1975), JA 131, which repealed 47 C.F.R. § 76.225(e), and the Commission took the view in that *Order* that it could repeal the equivalent subscription broadcast television section of its regulations, 47 C.F.R. § 73.643(g), as well. *See* —— FCC 2d ——, JA 139. Such an extension is technically in violation of the Administrative Procedure Act, 5 U.S.C. § 553(b) (1970), because the broadcast inquiry was terminated and the *Second Further Notice of Proposed Rule Making*, 52 FCC 2d 83 (1975), JA 197, entered after the *First Report, supra*, made no reference to broadcast television. No party has raised an objection to this procedure, and we think that, given the similarity of the issues and parties involved, this was harmless error. *See* 5 U.S.C. § 706 (1970).

**6.** This group includes the major broadcast networks, the National Association of Broadcasters, and one group of *amici*.

**7.** This view is taken by the Justice Department, the cable television interests, producers of programs suitable for showing on either cable or broadcast television, and a group of *amici*.

**8.** Cable television system operators or channel lessees engaging in origination or access cablecasting operations for which a per-pro-

gram or per channel [sic] charge is made shall comply with the following requirements:

(a) Feature films shall not be cablecast by a cable television system subject to the mandatory signal carriage requirements of Subpart D of this Part 76, except as provided in this paragraph.

(1) A feature film may be cablecast if—

(i) The film has been in general release in theaters anywhere in the United States for three (3) years or less prior to its proposed cablecast;

(ii) A conventional television broadcast station licensed in the market of the cable television system holds a present contractual right to exhibit the film. For purposes of this subdivision, a television station affiliated with a television network will be deemed to hold a present contractual right to exhibit a film if the network to which it is affiliated holds such a right;

(iii) The film has been in general release in theaters anywhere in the United States for more than ten (10) years prior to its proposed cablecast and the film has not been exhibited in the market of the cable television system over conventional television for three (3) years prior to its proposed cablecast. Once a film has been cablecast in the market pursuant to this subdivision, or broadcast on a subscription basis pursuant to § 73.-643(a)(1)(iii), such film may thereafter be cablecast in the market without regard to its subsequent exhibition over conventional television;

(iv) The film is in a foreign language;

(2) Feature films otherwise excluded by this parag[r]aph may be cablecast upon a convincing showing to the Commission that they are not desired for exhibition over conventional television in the market of the cable television system, or that the owners of the broadcast rights to the films, even absent the existence of subscription television, would not make the films available to conventional television.

(3) Every cable television system operator or channel lessee engaging in origination or access cablecasting pursuant to this paragraph shall maintain, or cause to be maintained, for public inspection a file listing the

these rules is to restrict sharply the ability of cablecasters to present feature film and sports programs if a separate program or channel charge is made for this material. In addition, the rules prohibit cablecasters from devoting more than 90 percent of their cablecast hours to movie and sports programs and further bar cablecasters from showing commercial advertising on cable channels on which programs are presented for a direct charge to the viewer.[9] Virtually identical restrictions apply to subscription broadcast television.[10] To understand

title of the film, the date on which it was cablecast and the provision of this paragraph pursuant to which it was cablecast. When a feature film is cablecast pursuant to paragraph (a)(1)(ii) of this section, the station or network serving the market and holding a present contractual right to exhibit the film shall be specified. These files shall be retained for a period of two years.

(b) Sports events shall not be cablecast live by a cable television system subject to the mandatory signal carriage requirements of Subpart D of Part 76, except as provided in this paragraph.

(1) A specific event may be cablecast if the event has not been broadcast live over conventional television in the market of the cable television system during any one of the five (5) seasons preceding the proposed cablecast. If a regularly recurring event takes place at intervals of more than one year (e. g., summer Olympic games), the event shall not be cablecast if it has been broadcast live over conventional television in the market during any one of the ten (10) years preceding the proposed cablecast.

(2) New specific sports events that result from the restructuring of existing sports shall not be cablecast until five (5) seasons after their first occurrence. Thereafter, subscription cablecasts shall be governed by paragraph (b)(1) of this section.

(3) The number of non-specific events which may be cablecast in any given season shall be determined as follows:

(i) If less than twenty-five (25) percent of the events in a category of non-specific events were broadcast live over conventional television in the market of the cable television system during each of the five (5) seasons preceding the proposed cablecast, the number of events in the category cablecast shall not exceed the number of events in the category not broadcast in that season among the preceding five (5) seasons when the largest number of events in the category were broadcast.

(ii) If twenty-five (25) percent or more of the events in a category of non-specific events were broadcast live over conventional television in the market of the cable television system during any one of the five (5) seasons preceding the proposed cablecast, the number of events in the category cablecast shall not exceed fifty (50) percent of the number of events in the category not broadcast in that season among the preceding five

(5) seasons when the largest number of events in the category were broadcast. However, if the number of events in the category to be broadcast in the current season is a reduction from the number of events broadcast in that season among the preceding five (5) seasons when the largest number of events in the category were broadcast, the number of events in the category which may be cablecast pursuant to this subparagraph shall be reduced in proportion to the reduction in events broadcast.

(c) Not more than ninety (90) percent of the total cablecast programming hours shall consist of feature films and sports events combined. The percentage calculations may be made on a yearly basis, but absent a showing of good cause, the percentage of such programming hours may not exceed ninety-five (95) percent of the total cablecast programming hours in any calendar month.

(d) No commercial advertising announcements shall be carried on subscription channels during such operations except before and after such programs for promotion of other programs for which a per-program or per-channel charge is made.

47 C.F.R. § 76.225 (1975), *as amended by Second Report and Order, supra* note 5.

**9.** Commercial advertising on cablecast channels not used for subscription cablecasting was also, at one time, restricted by the Commission. *See* 47 C.F.R. § 74.1117 (1969), *deleted,* 39 Fed.Reg. 43310 (1974).

**10.** Subscription television broadcast programming shall comply with the following requirements:

(a) *Feature films shall not be broadcast except as provided in this paragraph.*

(1) A feature film may be broadcast if—

(i) The film has been in general release in theaters anywhere in the United States for three (3) years or less prior to its proposed broadcast;

(ii) A conventional television broadcast station licensed in the market of the subscription television broadcast station holds a present contractual right to exhibit the film. For purposes of this subdivision, a television station affiliated with a television network will be deemed to hold a present contractual right to exhibit a film if the network to which it is affiliated holds such a right;

(iii) The film has been in general release in theaters anywhere in the United States for

the function of these rules, it is useful to trace their origins.

The first application to establish a subscription broadcast television service was

more than ten (10) years prior to its proposed subscription broadcast and the film has not been exhibited over conventional television in the market of the subscription television broadcast station for three (3) years prior to its proposed subscription broadcast. Once a film has been broadcast in the market pursuant to this subdivision or cablecast on a subscription basis pursuant to § 76.225(a)(1)(iii), such film may thereafter be broadcast on a subscription basis in the market without regard to its subsequent exhibition over conventional television;

(iv) The film is in a foreign language;

(2) Feature films otherwise excluded by this paragraph may be broadcast upon a convincing showing to the Commission that they are not desired for exhibition over conventional television in the market or that the owners of the broadcast rights to the films, even absent the existence of subscription television, would not make the films available to conventional television.

(3) Every subscription television broadcast station over which a feature film is broadcast pursuant to this paragraph shall maintain for public inspection a file listing the title of the film, the date on which it was broadcast and the provision of this paragraph pursuant to which it was broadcast. When a feature film is broadcast pursuant to subparagraph (1)(ii) of this paragraph, the station or network, serving the market and holding a present contractual right to exhibit the film shall be specified. These files shall be retained for a period of two years.

(b) Sports events shall not be broadcast live except as provided in this paragraph.

(1) A specific event may be broadcast if the event has not been broadcast live over conventional television in the market of the subscription television broadcast station during any one of the five (5) seasons preceding the proposed subscription broadcast. If a regularly recurring event takes place at intervals of more than one year (e. g., summer Olympic games), the event shall not be broadcast on a subscription basis if it has been broadcast live over conventional television in the market of the subscription television broadcast station during any one of the ten (10) years preceding the proposed subscription broadcast.

(2) New specific sports events that result from the restructuring of existing sports shall not be broadcast on a subscription basis until five (5) seasons after their first occurrence. Thereafter, subscription broadcasts shall be governed by paragraph (b)(1) of this section.

(3) The number of non-specific events which may be broadcast on a subscription basis in any given season shall be determined as follows:

(i) If less than twenty-five (25) percent of the events in a category of non-specific events were broadcast live over conventional television in the market of the subscription television broadcast station during each of the five (5) seasons preceding the proposed subscription broadcast, the number of events in the category broadcast on a subscription basis shall not exceed the number of events in the category not conventionally broadcast in that season among the preceding five (5) seasons when the largest number of events in the category were broadcast over conventional television.

(ii) If twenty-five (25) percent or more of the events in a category of non-specific events were broadcast live over conventional television in the market of the subscription television broadcast station during any one of the five (5) seasons preceding the proposed subscription broadcast, the number of events in the category broadcast on a subscription basis shall not exceed fifty (50) percent of the number of events in the category not broadcast in that season among the preceding five (5) seasons when the largest number of events in the category were broadcast over conventional television. However, if the number of events in the category to be broadcast over conventional television in the current season is a reduction from the number of events broadcast in that season among the preceding five (5) seasons when the largest number of events in the category were broadcast, the number of events in the category which may be broadcast on a subscription basis pursuant to this subparagraph shall be reduced in proportion to the reduction in events broadcast over conventional television.

(c) No commercial advertising announcements shall be carried during subscription television operations except for promotion of subscription television broadcast programs before and after such programs.

(d) Not more than 90 percent of the total subscription programming hours shall consist of feature films and sports events combined. The percentage calculations may be made on a yearly basis, but, absent a showing of good cause, the percentage of such programming hours may not exceed 90 percent of the total subscription programming hours in any calendar month.

(e) Any television broadcast station licensee or permittee authorized to broadcast subscription programs shall broadcast in addition to its subscription broadcasts, at least the minimum hours of nonsubscription programming required by § 73.651.

(f) Except as they may be otherwise waived by the Commission in authorizations

filed with the Commission in 1952.[11] After a series of administrative proceedings and hearings before Congress,[12] the Commission announced in 1959 that it would license a number of trial systems in order to gather information about the technical and economic aspects of subscription television.[13] In its *Fourth Report and Order*, 15 FCC 2d 466, issued in 1968, the Commission analyzed in detail results achieved in the Hartford, Connecticut trial system and concluded that permanent subscription operations should be authorized with certain limitations.

For present purposes, the relevant limitations included restrictions on feature films, sports events, and series programs that could be shown for a fee, and prohibited commercial advertising during subscription operations.[14] The purpose of these limitations was twofold. First, the Commission had agonized over both its authority to dedicate one or more channels from the electronic spectrum to subscription operations and the desirability of doing so. Such channels are scarce, and opponents of subscription television had argued that they should be used for conventional programming which would, of course, be free to all viewers.[15] The Commission ultimately concluded that it had the required authority,[16] a position sustained by this Court in *National Ass'n of Theatre Owners (NATO) v. FCC*, 136 U.S.App.D.C. 352, 420 F.2d 194 (1969), *cert. denied*, 397 U.S. 922, 90 S.Ct. 914, 25 L.Ed.2d 102 (1970), but that subscription service would not be desirable unless the programming presented was distinct from that on conventional advertiser-supported television.[17] As a result, the Commission placed restrictions on the number of hours of feature films and sports programs, both readily available on conventional television, that could be shown and prohibited commercial advertising in an effort to remove any economic pressure to appeal to a mass audience, a pressure to which the Commission attributed the sameness of conventional television fare.[18] A second reason for restricting the feature films, sports events, and series programs that could be shown on subscription television was the Commission's fear that the revenue derived from subscription operations would be sufficient to allow subscription operators to bid away the best programs in these categories, thus reducing the quality of conventional television.[19] By limiting the subscription operator to material that would not otherwise be shown on television, the Commission hoped both to prevent such "siphoning"[20] and to enhance the diversity of program offerings on broadcast television as a whole.

The cable television industry has a similarly lengthy technical and regulatory history. Starting in the 1940's as community antenna television systems (CATV) designed to bring better or more distant broadcast signals into the home, cable sys-

issued hereunder, the rules and policies applicable to regular television broadcast stations are applicable to subscription television operations.
47 C.F.R. § 73.643 (1975), *as amended by Second Report and Order, supra* note 5.

11. *See* 20 Fed.Reg. 988 n.1 (1955).

12. *See generally NATO v. FCC, supra* note 5, 136 U.S.App.D.C. at 354, 420 F.2d at 196.

13. *Third Report*, 26 FCC 265 (1959), *aff'd. Connecticut Committee Against Pay TV v. FCC*, 112 U.S.App.D.C. 248, 301 F.2d 835, *cert. denied*, 371 U.S. 816, 83 S.Ct. 28, 9 L.Ed.2d 57 (1962).

14. *See* 15 FCC 2d at 597–598.

15. *See generally Fourth Report and Order, supra* note 5, 15 FCC 2d at 466–488.

16. *See First Report*, 23 FCC 532, 536–540 (1957).

17. *See Fourth Report, supra* note 5, 15 FCC 2d at 483–488.

18. *See id.* at 474–488, 564–566. *See also First Report and Order, supra* note 2, 52 FCC 2d at 43, JA 67; *Report and Order*, 23 FCC 2d 382, 391–392 (1970) (Docket 12782).

19. *See Fourth Report, supra* note 5, 15 FCC 2d at 554–573

20. In these proceedings the Commission has changed its vocabulary from the pejorative "siphoning" to the more neutral term "migration." *See* Transcript of Oral Argument at 56, 57, 59.

tems developed through the 1960's into media with enough channels to accommodate both retransmission of broadcast television programs and origination of special services such as weather or stock exchange reports.[21] More recently, cable companies began cablecasting their own programs on channels not used for retransmission services, and the abundance of channels on modern systems (presently 35 or more)[22] promises that program origination will remain an important part of cable programming.

The Commission's regulation of cable television reflects its technological development. At first the Commission eschewed regulation altogether.[23] However, as CATV systems with multiple channels developed, the Commission asserted jurisdiction over cable operations to prevent fragmentation of audiences and revenues between local broadcasters and competing cable systems which were bringing distant broadcast signals into local markets.[24] In 1968 the Commission launched a further, broad-ranging inquiry into the uses to which cable television might be put in the national communications network.[25] The outcome of these proceedings was a series of regulations which, among other things, required cable systems in major markets to provide cablecasting services, to set aside "access channels" on which members of the public could rent time to produce and transmit their own shows, and to furnish channels for government and educational use.[26] The Commission specifically declined, however, to promulgate rules for cable television similar to those adopted for subscription broadcast television. *See First Report and Order*, 20 FCC2d 201, 204 (1969). The reasons given were that the Commission had no information which would indicate that pay cable television could penetrate any television market to the extent needed to "siphon" programming, *see id.* at 204 & n.4, and that the Commission would in any event be able to act in time to correct any adverse effects on conventional broadcasting, *see id.* at 204.

Nine months later the Commission reversed its course and applied the rules developed in the subscription broadcast field to cable television. *See Memorandum Opinion and Order*, 23 FCC2d 825 (1970). The reasons for such a quick reversal are not clear in the *Order* and a number of the petitioners here filed petitions to reconsider imposition of the subscription broadcast rules on the ground that the Commission's abrupt change of course was arbitrary and not adequately explained. *See Notice of Proposed Rule Making and Memorandum Opinion and Order*, 35 FCC2d 893, 894 n. 5 (1972), JA 2. These petitions for reconsideration were denied. *See id.* at 899, JA 7. In this same order Docket 19554, which spawned the orders reviewed here, was established.[27] In its *First Report and Order*

---

**21.** *See* Cabinet Comm. on Cable Communications, Report to the President 10–11 (1974).

**22.** *See* Transcript of Oral Argument at 43; br. for petitioner Home Box Office at 9.

**23.** *See* Cabinet Comm. on Cable Communications, *supra* note 21, at 10.

**24.** *See generally United States v. Southwestern Cable Co.*, 392 U.S. 157, 161–168, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968).

**25.** *Notice of Proposed Rulemaking and Notice of Inquiry*, 15 FCC 2d 417 (1968).

**26.** *First Report and Order*, 20 FCC 2d 201, 223–225 (1969). The Commission also extended the equal time, sponsorship identification, and fairness doctrines to cable television in this *Order*.

**27.** Many parties to this proceeding, *see e. g.,* br. for respondent United States; br. for petitioner Home Box Office, Inc., including the Commission itself, *see* br. for respondent FCC, have presented arguments predicated on an assumption that it is appropriate for this court to review the validity of the pay cablecasting rules *de novo,* although other parties, *see, e. g.,* br. of petitioner American Broadcasting Companies, Inc., appear to take the position that only the rather limited question of the validity of the relaxation of prior Commission rules is before this court. No party has addressed this problem expressly, although the Commission, in *In re Home Box Office, Inc., supra* note 5, 51 FCC2d at 321, JA 145, takes the position that the rules promulgated in its *Memorandum*

in this docket, 52 FCC2d 1 (1975), JA 25, the Commission re-adopted, with minor modifi-

*Opinion and Order* in Docket 18397, 23 FCC2d 825 (1970), are final. Upon review of the record, we hold today that, as to pay cablecasting, the rules are before us for *de novo* consideration.

The critical question is the effect of the Commission's *Notice of Proposed Rule Making and Memorandum Opinion and Order,* 35 FCC2d 893 (1972), JA 1. In that *Order* the Commission, after surveying points raised by the petitions for reconsideration before it (some of which were addressed to procedural infirmities and others to the substance of the *Memorandum Opinion and Order* in Docket 18397, *supra* ), stated:

8. * * * [I]n view of the importance of the issue as against the paucity of prior comment and the indication that additional opportunity for comment *will elicit useful new material,* we have decided to issue a further *Notice of Proposed Rule Making* so that we may hear from all parties concerned and *to reconsider the rules.*

* * · * * * *

10. In light of our decision to allow for further comment on the pay-cablecasting rules, we think it unnecessary to comment at length on the [substantive] issues raised in the reconsideration pleadings. * * *

35 FCC2d at 896, 897–898, JA 4, 5–6 (emphasis added). Nonetheless, the Commission, "[i]n accordance with" the above quoted paragraphs, denied the petitions for reconsideration of its *Memorandum Opinion and Order* in Docket 18397. *Id.* at 899, JA 7.

We think such a disposition is fundamentally at odds with the purpose of reconsideration as envisioned by § 405 of the Communications Act, 47 U.S.C. § 405 (1970), and is also contrary to the Commission's own rules, 47 C.F.R. § 1.106 (1975). Section 405 of the Communications Act provides in relevant part:

* * * The filing of a petition for rehearing shall not be a condition precedent to judicial review of any * * * order, decision, report, or action, except where the party seeking such review (1) was not a party to the proceedings resulting in such order, decision, report, or action, or (2) relies on questions of fact or law upon which the Commission * * * has been afforded no opportunity to pass. The Commission * * * shall enter an order, with a concise statement of the reasons therefor, denying a petition for rehearing or *granting such petition, in whole* or in part, and ordering such further proceedings as may be appropriate. * * *

The *obvious purpose of* § 405 is to afford the Commission an opportunity to consider and pass upon matters prior to their presentation to the court. *Joseph v. FCC,* 131 U.S.App.D.C. 207, 210, 404 F.2d 207, 210 (1968); *Gerico Investment Co. v. FCC,* 99 U.S.App.D.C. 379,

cations, the pay cable rules originally announced. Petitions for reconsideration of

380, 240 F.2d 410, 411 (1957); *see Saginaw Broadcasting Co. v. FCC,* 68 App.D.C. 282, 286, 96 F.2d 554, 558, *cert. denied,* 305 U.S. 613, 59 S.Ct. 72, 83 L.Ed. 391 (1938). To hold, as the Commission has done here, that further consideration of its order is needed but that the order is nonetheless final for purposes of judicial review is to thwart this fundamental purpose of § 405. Moreover, had a party taken an immediate appeal from the *Notice of Proposed Rule Making and Memorandum Opinion and Order, supra,* this court would in all likelihood have deferred consideration of that appeal until the Commission had finished its reconsideration of the rules in order to have the benefit of the further proceedings. *See Wrather-Alvarez Broadcasting, Inc. v. FCC,* 101 U.S.App.D.C. 324, 327, 248 F.2d 646, 649 (1957). Finally, the "concise statement of reasons" given by the Commission here is tantamount to the statement: "We have denied your petitions for reconsideration because you have raised such serious issues that we think the rules need to be reconsidered." Surely, denial on these grounds is arbitrary, capricious, and in clear contravention of the purposes of § 405.

We need not rely on § 405 alone, however, because the Commission's own procedural rules disallow the disposition of the petitions for reconsideration made here. As we read § 1.106 of those rules, the Commission may dispose of petitions for reconsideration in only three ways. First, it may deny the petitions. 47 C.F.R. § 1.106(j) (1975). Second, it may grant a petition and make a ruling on its merits in the same order. *Id.* § 1.106(k)(1). Third, it may grant a petition but defer its ruling on the merits until after further proceedings. *Id.* § 1.106(k)(2). Here, however, the Commission has taken a fourth course—instituting further proceedings in order to rule on the merits of the petitions for reconsideration, but also denying the petitions. In contrast, in the same *Notice of Proposed Rule Making and Memorandum Opinion and Order* the Commission adopted the procedure set out in § 1.106(k)(2) with regard to its proceedings on subscription broadcast television. *See* 35 FCC2d at 899, JA 7. We think the proper procedure here too would have been that set out in § 1.106(k)(2), *and we therefore hold that the Commission's* order with respect to pay cablecasting must be read to be consistent with that section. In accordance with § 1.106(k)(2), therefore, we further hold that the orders entered in Docket 19554 are the rulings on the merits of the petitions for reconsideration.

Although we would normally be hesitant to decide the merits of an appeal where the briefs of the parties indicate a fundamental confusion over the issues open on appeal, we do not think that our disposition of the procedural posture

this *Report and Order* were denied, except to the extent that some petitioners sought to establish reporting requirements designed to enhance enforcement of the rules. *Memorandum Opinion and Order,* 54 FCC2d 797 (1975), JA 117. Contemporaneously the Commission issued a *Second Further Notice of Proposed Rule Making,* 52 FCC2d 83 (1975), JA 107, eliciting additional information on the rules relating to series programming.[28] On the basis of that information the Commission deleted any restriction on subscription use of series programs. *Second Report and Order,* —— FCC2d ——, 35 P & F Radio Reg.2d 767 (1975), JA 131.[29]

To understand the postulated "siphoning" phenomenon and its potential harm, it is useful to consider the structure of the television industry today. In 1975 there were 70.1 million American homes with television sets, of which 9.8 million had access to some cable system.[30] Although the number of cable subscribers is large, individual cable systems are quite small, with the largest having only 101,000 customers[31] and with only 224 of approximately 3,405 systems having more than 10,000 subscribers.[32] The number of homes that presently have access to pay cable facilities is about a half million and is growing rapidly.[33] Most of these homes are located outside major television

markets, with the exception of the New York City area and parts of California.[34] Extension of service to other urban areas might be accomplished at a capital cost of some $8 billion, but laying cable to reach that half of the American population which lives in rural areas would by any estimate be extremely expensive, perhaps requiring an additional $240 billion.[35] Because of these capital requirements, extension of cable service with cablecasting capability to the country as a whole does not seem possible in the immediate future.

Similarly, access of all Americans to cable seems foreclosed by the cost of cable service. Cable service charges are generally separated into two distinct fees, one basic fee entitling the viewer to receive only broadcast signals, the other entitling the viewer to see cablecast programs as well. The basic fee is approximately $5–$6 monthly.[36] Technical capability exists today to distribute and bill for cablecast programs on a program-by-program basis, but this is not currently done. Instead a single fee of $5–$7 monthly, in addition to the basic fee, is charged for access to the cablecasting channels.[37] Nonetheless, as the name of one petitioner suggests, it is quite literally possible to turn the home receiver into a "Home Box Office," thereby market-

---

of this case is prejudicial to any of the parties before us. Although we do not have the benefit of a record of the proceedings in Docket 18397, which would normally be part of the record on an appeal from the grant of a motion to reconsider, the Commission has itself commented on the "paucity" of information in that record. *See* 35 FCC2d at 896, JA 7. Moreover, many of the parties who took the position that the issue here was relaxation of prior rules in fact made arguments that were relevant only if the issue was *de novo* reconsideration. Furthermore, the Commission itself adequately represented those who would defend the rules on *de novo* review.

For all foregoing reasons, we hold that the effect of our ruling today is to remove *in toto* all regulations of the Commission—now codified at 47 C.F.R. § 76.225 (1975)—regulating program formats on pay cable television.

28. Series programs are those "with interconnected plot or substantially the same cast of principal characters." 47 C.F.R. § 76.225(c), *deleted by Second Report and Order, supra* note 5.

29. *See also* note 5 *supra.*

30. Staff of Subcomm. on Communications of House Comm. on Interstate and Foreign Commerce, Cable Television: Promise Versus Regulatory Performance 11 (1976) (Subcomm. Print) (hereinafter cited as Promise Versus Performance).

31. *Id.* at 19.

32. *Id.* at 17.

33. Transcript of Oral Argument at 4, 27.

34. *Id.* at 77.

35. *Id.* at 26.

36. Promise Versus Performance, *supra* note 30, at 17.

37. *First Report and Order, supra* note 2, 52 FCC2d at 2, JA 26.

ing television features in much the same way that movies are marketed in theaters today. As with other box offices, however, only those with enough money to buy a ticket can get in to see the show.

Siphoning is said to occur when an event or program currently shown on conventional free television is purchased by a cable operator for showing on a subscription cable channel. If such a transfer occurs, the Commission believes, the program or event will become unavailable for showing on the free television system or its showing on free television will be delayed (since the commercial appeal of the cable showing is the assurance of earlier access to program material, an assurance that might itself be brought about by agreement between the seller of the program or event and the subscription cablecaster).[38] In either case a segment of the American people—those in areas not served by cable or those too poor to afford subscription cable service—could receive delayed access to the program or could be denied access altogether. The ability of the half-million cable subscribers thus to preempt the other 70 million television homes is said to arise from the fact that subscribers are willing to pay more to see certain types of features than are advertisers to spread their messages by attaching them to those same features. For example, according to Commissioner Robinson,[39] subscribers may be willing to pay 15 to 30 cents per viewing hour for the privilege of viewing a recent feature film, while advertisers are willing to pay only three cents per viewer. As a result a pay audience of one million could routinely buy a film away from a nonpaying audience of five to ten million.

Whether such a siphoning scenario is in fact likely to occur and, if so, whether the result of siphoning would be to lower the quality of free television programming available to certain areas of the country or to certain economic strata of the population are matters of great dispute among the Commission and the various petitioners and intervenors seeking review of the Commission's regulations in this case. Other petitioners both here and before the Commission argue that the rules which ostensibly place cable in a subordinate role in order to increase program diversity—a goal which has been basic to a number of Commission regulations [40]—in fact diminish diversity by prohibiting subscription cable operators from showing the programs that are most likely to be the financial backbone of a successful cable operation. As a result, it is claimed, cultural and minority programming that could otherwise "piggyback" on a cable system supported by more broadly popular fare is precluded. Indeed, some petitioners argue that the subscription broadcast television rules had the effect of killing that medium in its infancy by denying it access to necessary programming—a charge supported by the apparent lack of any viable commercial applications of subscription broadcast television today and left unrefuted by the Commission—and urge us not to let the Commission similarly snuff out pay cable. Finally, other petitioners take the position that the threat of siphoning is very real and that the Commission's rules do not adequately cope with this threat to conventional television service.

## II. PAY CABLE RULES

### A. *Statutory Authority*

■ In determining the Commission's authority to promulgate the pay cable rules, we by no means write on a clean slate. This court has recognized that the Commu-

---

**38.** The position of the Commission is not clear. The concern in the subscription television proceeding was that material shown on subscription television would simply become unavailable for conventional viewing. *See Fourth Report and Order, supra* note 5, 15 FCC2d at 494–509. Here, at least with regard to feature films, the Commission seems to have identified the evil to be avoided as delay in showing a film on conventional television. *See First Re-*

*port and Order, supra* note 5, 52 FCC2d at 49–50 (¶ 162) JA 73–74.

**39.** *First Report and Order, supra* note 5, 52 FCC2d at 77 (dissenting opinion), JA 101.

**40.** *E. g.,* 47 C.F.R. § 76.201 (1974) (origination requirements), *removed,* 39 Fed.Reg. 43310 (1974); 47 C.F.R. § 73.658 (prime time access regulations).

nications Act of 1934, 47 U.S.C. § 151 *et seq.*, must be construed at least in some circumstances to allow the Commission to regulate cable television system operations. *See Carter Mountain Transmission Corp. v. FCC,* 116 U.S.App.D.C. 93, 321 F.2d 359, *cert. denied,* 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1963); *Buckeye Cablevision, Inc. v. FCC,* 128 U.S.App.D.C. 262, 387 F.2d 220 (1967). This view has been adopted by other Courts of Appeals, *see, e. g., American Civil Liberties Union v. FCC,* 523 F.2d 1344, 1351 (9th Cir. 1975), and confirmed by the Supreme Court, *see United States v. Midwest Video Corp.,* 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972); *United States v. Southwestern Cable Co.,* 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968). As the Supreme Court explained in *Southwestern Cable, supra,* to construe the Communications Act narrowly would be to defeat the purpose of Congress " 'to maintain, through appropriate administrative control, a grip on the dynamic aspects of radio transmission.' " 392 U.S. at 172, 88 S.Ct. at 2002, *quoting FCC v. Pottsville Broadcasting Co.,* 309 U.S. 134, 138, 60 S.Ct. 437, 84 L.Ed. 656 (1940). Yet, despite the latitude which must be given the Commission to deal with evolving technology, its regulatory authority over cable television is not a *carte blanche.* Unless these regulations are "justified by reasons which are properly the concern of [the Commission]," *Hampton v. Mow Sun Wong,* 426 U.S. 88, 116, 96 S.Ct. 1895, 1912, 48 L.Ed.2d 495 (1976), they must be set aside.

### 1. *The Standard for Determining Statutory Authority*

■ *Midwest Video Corp.* and *Southwestern Cable Co.* hold that the Commission may only exercise authority over cable television to the extent "reasonably ancillary" to the Commission's jurisdiction over broadcast television. *United States v. Southwestern Cable Co., supra,* 392 U.S. at 178, 88 S.Ct. 1994; *United States v. Midwest Video Corp., supra,* 406 U.S. at 670, 92 S.Ct. 1860. *See generally National Ass'n of Regulatory Utility Comm'rs v. FCC,* 174 U.S. App.D.C. 374, 379–380, 394–395, 401–406, 533 F.2d 601, 606–607, 621–622, 628–633 (1976). This standard was first enunciated in *Southwestern Cable Co.,* in which the Supreme Court was asked to pass on the Commission's authority to promulgate rules prohibiting importation of "distant signals" [41] into the San Diego television market. 392 U.S. at 159–160, 88 S.Ct. 1994. The purpose of these rules was to prevent division of audiences and revenues between cable television and fledgling UHF and educational television stations. Competition by cable operators, the Commission feared, would make these new ventures unprofitable, thereby frustrating the Commission's long-standing [42] and congressionally approved [43] policy of attempting to provide locally controlled broadcast television service. *See* 392 U.S. at 173–177, 88 S.Ct. 1994.

In finding that the Commission was authorized to promulgate the challenged rules, the *Southwestern* Court first held that cable television was an instrument of "interstate and foreign communication by wire or radio" within the meaning of Section 2(a) of the Communications Act of 1934, 47 U.S.C. § 152(a) (1970). 392 U.S. at 167–169, 88 S.Ct. 1994. For this reason the Commission

**41.** Distant signals are those which a viewer would not ordinarily be able to receive without the assistance of a community antenna television system.

**42.** *See United States v. Southwestern Cable Co., supra* note 24, 392 U.S. at 174–176 & n. 43, 88 S.Ct. 1994. *See generally* R. Noll, M. Peck & J. McGowan, Economic Aspects of Television Regulation 99–108 (1973).

**43.** The *Southwestern* Court referred a number of times to instances of congressional approval of the Commission's policy of local control of broadcasting. *See* 392 U.S. at 173 & n. 38, 88 S.Ct. 1994; *id.* at 174 & n. 39, 88 S.Ct. 1994; *cf. id.* at 175–176 n. 43, 88 S.Ct. 1994. The Court also referred to congressional support for the Commission's policy of encouraging UHF development, and read legislation requiring television receivers shipped in interstate commerce to have UHF capability, Pub.L.No. 87–529, 76 Stat. 150 (1962), as support for the Commission's restrictions on cable. *See* 392 U.S. at 175 & nn.41 & 42, 88 S.Ct. 1994.

was held to have "regulatory authority" over cable television. *Id.* at 173, 88 S.Ct. 1994. However, the Court chose not "to determine in detail the limits of the Commission's authority to regulate [cable television]" under Section 2(a). *Id.* at 178, 88 S.Ct. at 2005. Instead, stressing that " 'the achievement of an agency's ultimate purposes' " was at stake, *id.* at 177, 88 S.Ct. at 2005, *quoting Permian Basin Area Rate Cases,* 390 U.S. 747, 780, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968), the Court noted that the rules were "reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting," *id.* at 178, 88 S.Ct. at 2005, and that to carry out such responsibilities the Commission could "issue 'such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law' as 'public convenience, interest, or necessity requires.' " *Id., quoting* 47 U.S.C. § 303(r) (1970).

In *United States v. Midwest Video Corp., supra,* a decision which affirmed the Commission's jurisdiction by a narrow margin, a four-judge plurality of the Supreme Court again applied the "reasonably ancillary" standard to determine the scope of the Commission's jurisdiction over cable television operations. Upholding the Commission's rules requiring operators of large cable systems to cablecast programs on some channels, the plurality reiterated that Section 2(a) conferred regulatory power on the Commission, but that "§ 2(a) does not in and of itself prescribe any objectives for which the Commission's regulatory power over [cable television] might properly be exercised." 406 U.S. at 661, 92 S.Ct. at 1867. The plurality then stated that the test for determining whether a rule reflected a proper objective was whether it would " 'further the achievement of long-established regulatory goals in the field of television broadcasting.' " *Id.* at 667–668, 92 S.Ct. at 1870, *quoting United States v.*

*Southwestern Cable Co., supra,* 392 U.S. at 654, 88 S.Ct. 1994. Under this standard the Commission was held to be authorized to require cable program origination since such a requirement furthered Commission policies with respect to both enhancement of local service and diversification of control of available television and cable programming. *See* 406 U.S. at 668–670, 92 S.Ct. 1860.

The deciding vote in *Midwest Video Corp.* was cast by Chief Justice Burger, who wrote:

> Candor requires acknowledgment, for me at least, that the Commission's position strains the outer limits of even the open-ended and pervasive jurisdiction that has evolved by decisions of the Commission and the courts. * * *

406 U.S. at 676, 92 S.Ct. at 1874. Nonetheless, the Chief Justice was willing to uphold the challenged regulations on the ground that "when [cable system operators] interrupt the signal and put it to their own use for profit, they take on burdens, one of which is regulation by the Commission." *Id.*[44] Justice Douglas, writing for four dissenting Justices, took yet a third position, apparently agreeing that the appropriate test for Commission jurisdiction was expressed by the "reasonably ancillary" standard, but finding that to uphold the regulations challenged in *Midwest* would "make the Commission's authority over activities 'ancillary' to its responsibilities greater than its authority over any broadcast licensee." *Id.* at 681, 92 S.Ct. at 1877.

The Supreme Court's opinions in *Southwestern Cable Co.* and *Midwest Video Corp.* thus look in two directions. First, they recognize an expansive jurisdiction for the Commission based on Section 2(a) of the Communications Act and the need to give the Commission sufficient latitude to cope with technological developments in a rapidly changing field. But the opinions are also

---

44. Were one to accept the Chief Justice's theory of jurisdiction, the Commission's rules would have to be set aside with respect to access cablecasters, *see* note 2 *supra,* who rent time from those who "interrupt the signal," since there is no evidence in this record that these independent entrepreneurs are in any way subsidized by cable system owners who are the only legal entities offering retransmission services.

narrow. Even the broadest opinion, that of the plurality in *Midwest Video Corp.*, recognizes that the Commission, can act only for ends for which it could also regulate broadcast television. Indeed, even this standard will be too commodious in certain cases, since as we discuss in Part III *infra* the scope of the Commission's constitutionally permitted authority over broadcast television in areas impinging on the First Amendment is broader than its authority over cable television. Finally, the opinions in both cases go no farther than to allow the Commission to regulate to achieve "long-established" goals or to protect its "ultimate purposes." That these cases establish an outer boundary to the Commission's authority we have no doubt, *cf. National Ass'n of Regulatory Utility Comm'rs v. FCC, supra* ; Staff of Subcomm. on Communications, Comm. on Interstate and Foreign Commerce, Cable Television: Promise Versus Regulatory Performance 80–83 (1976) (Subcomm. Print), and if judicial review is to be effective in keeping the Commission within that boundary, we think the Commission must either demonstrate specific support for its actions in the language of the Communications Act or at least be able to ground them in a well-understood and consistently held policy developed in the Commission's regulation of broadcast television, *cf. Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 394, 444 F.2d 841, 852 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971).*

### 2. *Applying the Jurisdictional Standard*

■ The purpose of the Commission's pay cable rules is to prevent "siphoning" of feature film and sports material from conventional broadcast television to pay cable.[45] Although there is dispute over the effectiveness of the rules, it is clear that their thrust is to prevent *any* competition by pay cable entrepreneurs for film or sports material that either has been shown on conventional television *or* is likely to be shown there.[46] How such an effect furthers any legitimate goal of the Communications Act is not clear. The Commission states only that its "mandate to act in the public interest requires that [it] strive to maintain the public's ability to receive the informational and entertainment programming now provided by conventional television at no direct cost," *First Report and Order, supra,* 52 FCC2d at 43, JA 67, and that its action "is designed to enhance the integrity of broadcast signals and is a proper execution of our responsibility under Section 2(b) [*sic*] of the Communications Act * * *," *id.* at 45, JA 69.

Insofar as the Commission places reliance on such conclusory phrases as "enhance the integrity of broadcast signals," we think it has crossed "the line from the tolerably terse to the intolerably mute." *Greater Boston Television Corp. v. FCC, supra,* 143 U.S.App.D.C. at 394, 444 F.2d at 852. Beneath such generalities, however, the Commission seems to be making two more specific arguments which relate the public interest to retention of the conventional television structure. First, the Commission appears to take the position that it has both the obligation and the authority to regulate program format content to maintain present levels of public enjoyment. For

---

* Judge MacKinnon is of the view that the FCC's jurisdiction to regulate cablecasting in the interests of the broadcasting industry is restricted to instances where the cable stations substantially rely on broadcast signals or their activities amount to unfair competition.

45. As promulgated in the *First Report and Order, supra* note 2, the rules also applied to series programming. Since the rules have subsequently been amended to delete series programming restrictions, *see* note 28 *supra,* we do not deal with this aspect of the rules here.

46. *See, e. g., First Report and Order, supra* note 2, 52 FCC2d at 51–55, JA 75–79. This position is most clearly expressed in the Commission's standard for waiving its film rules:

> [W]aivers will be granted upon a convincing showing to the Commission that a film desired for subscription exhibition is not desired for exhibition over conventional television in the market, or that the owner of the film, even absent the existence of subscription television, would not make the film available to conventional television.
>
> *Id.* at 55, JA 79.

this reason, and because the Commission also seems to assert that the overall level of public enjoyment of television entertainment would be reduced if films or sports events were shown only on pay cable or shown on conventional television only after some delay, it concludes that anti-siphoning rules are both needed and authorized. Second, and closely related, is the argument pressed here by counsel for the Commission that Section 1 of the Communications Act, 47 U.S.C. § 151 (1970), mandates the Commission to promulgate anti-siphoning rules since cable television cannot now and will not in the near future provide a nationwide communications service. *See* Transcript of Oral Argument at 57–58. Before considering each of these arguments in turn, we note that we do *not* understand the Commission to be asserting that subscription cable television will divide audiences and revenues available to broadcast stations in such a manner as to put the very existence of these stations in doubt. *See Memorandum Opinion and Order, supra,* 54 FCC2d at 800–802 (¶¶ 10, 11, 18), JA 120–122; *Second Report and Order, supra,* —— FCC2d at ——, 35 P & F Radio Reg.2d at 772, JA 136 ("[w]e possess no evidence which indicates that the advertising revenues generated by conventional television will be diminished as a result of subscription operations"). *See also First Report and Order,* 20 FCC2d 201, 216–217 (1969). The Supreme Court's opinion in *Southwestern Cable Co.* is not, therefore, directly applicable.

The question of the Commission's obligation or authority to regulate television to maintain public enjoyment is one whose analysis takes us into a thicket of disagreement between this court and the Commission. *See Citizens Committee to Save WEFM v. FCC,* 165 U.S.App.D.C. 185, 191–207, 506 F.2d 246, 252–268 (1974) (*en banc*). Although this controversy has taken place in the context of the Commission's obligation to regulate changes in radio broadcast formats, much of what has been said is directly relevant here.[47] The traditional

view of the Commission is well summarized by its then chairman, Dean Burch:

It would be a simple matter for the Commission to dictate to each licensee of the 62 stations in the Chicago area which entertainment format each should use. Such an approach might maximize—at least in the short run—the diversity of formats and types of programming available to the public. But it would not be the approach contemplated by Congress when it created the Commission in 1934. Broadcast stations are, of course, licensed to serve the public interest, but as the Supreme Court observed back in 1940, the Communications Act also "recognizes that the field of broadcasting is one of free competition." In short, "[t]he regulatory responsibility of the Commission in the broadcast field essentially involves the maintenance of a balance between the preservation of a free competitive broadcast system, on the one hand, and the reasonable restriction of that freedom inherent in the public interest standard provided in the Communications Act, on the other."

The Commission has struck this balance by requiring licensees to conduct formal surveys to ascertain the need for certain types of non-entertainment programming, while allowing licensees wide discretion in the area of entertainment programming. Thus with respect to the provision of news, public affairs, and other informational services to the community, we have required that broadcasters conduct thorough surveys designed to assure familiarity with community problems and then develop programming responsive to those identified needs. In contrast, we have generally left entertainment programming decisions to the licensee or applicant's judgment and competitive marketplace forces. As the Commission stated in its *Programming Policy Statement,* 25 Fed.Reg. 7293 (1960), "[o]ur view has been that the station's [entertainment]

---

**47.** The Communications Act does not expressly regulate television. Title III of the Act, which covers radio broadcasting, has been construed to cover television because § 3(b) of the Act, 47 U.S.C. § 153(b) (1970), defines "radio communication" to include transmission of pictures.

program format is a matter best left to the discretion of the licensee or applicants, since as a matter of public acceptance and of economic necessity he will tend to program to meet the preferences of his area and fill whatever void is left by the programming of other stations."

*Zenith Radio Corp.,* 40 FCC2d 223, 230 (1973) (footnotes omitted).[48] In addition, in many other proceedings the Commission has taken the position that the First Amendment and · the anti-censorship provision of the Communications Act, 47 U.S.C. § 326 (1970), strip it of any authority to require or to prohibit broadcast of any particular material. *See, e. g., Ad Hoc Comm. on the Sugar Bowl,* 29 P & F ˙Radio Reg.2d 70 (1973); *Broadcast of Elections Projections,* 38 FCC2d 378 (1972); *Washington Women's Strike for Peace,* 6 P & F Radio Reg.2d 307, 308 (1965). As we understand the traditional position of the Commission, therefore, it is that regulation of entertainment program format is inconsistent with the Communications Act and ˌis also unnecessary, but for reasons inapposite here.

■ In *WEFM* this court *en banc* rejected the *laissez faire* approach of the Commission, holding:

> There is a public interest in a diversity of broadcast entertainment formats. The disappearance of a distinctive format may deprive a significant segment of the public of the benefits of radio, at least at their first-preference level. When faced with a proposed license assignment encompassing a format change, the FCC is obliged to determine whether the format to be lóst is unique or otherwise serves a

specialized audience that would feel its loss. If the endangered format is of this variety, then the FCC must affirmatively consider whether the public interest would be served by approving the proposed assignment, which may, if there are substantial questions of fact or inadequate data in the application or other officially noticeable materials, necessitate conducting a public hearing in order to resolve the factual issues or assist the Commission in discerning the public interest. Finally, it is not sufficient justification for approving the application that the assignor has asserted financial losses in providing the special format; those losses must be attributable to the format itself in order logically to support an assignment that occasions a loss of the format.

165 U.S.App.D.C. at 201, 506 F.2d at 262. Our position is thus unmistakable: The Communications Act not only allows, but in some instances requires, the Commission to consider the preferences of the public, and the Commission in discharging this authority must regulate the entertainment programming which station owners can present whenever a significant segment of the public is threatened with the loss of a preferred broadcast format.* Were *WEFM* the last word, it is at least possible that the Commission could promulgate the anti-siphoning rules under the theory of jurisdiction recognized by the plurality in *Midwest Video Corp.,* since the end to be achieved— protection of ˙ preferred television service for those not served by cable television— would also justify regulation of the broadcast media.[49]

---

**48.** These views were not those of the Commission as a whole, but of only six commissioners. Nonetheless, the Commission as a whole has cited approvingly the argument quoted in text. *See Notice of Inquiry,* 57 FCC2d 580, 580–581 (1976).

\* Judge MacKinnon is of the view that *Citizens Committee to Save WEFM v. FCC,* 165 U.S. App.D.C. 185, 506 F.2d 246 (1974), constitutes a binding decision of this court, but he continues to adhere to the views he expressed in dissent when that decision issued. 165 U.S. App.D.C. at 224, 506 F.2d at 285.

**49.** While *WEFM* offers some support for the Commission's authority to promulgate anti-siphoning rules, the application of *WEFM* to cable television requires thought and argument going beyond anything said in that case. The facts of *WEFM* made it a particularly appropriate case for Commission intervention. At stake was a classical music format provided by only one other station in *WEFM*'s service area. 165 U.S.App.D.C. at 193, 506 F.2d at 254. On the other hand, the "contemporary music" format proposed for WEFM was already supplied in whole or in part by 13 of the Chicago area's 61 radio broadcast stations. *Id.* at 193

The Commission has not, however, acquiesced in *WEFM*. Instead, it recently launched and concluded a proceeding on "Changes in the Entertainment Formats of Broadcast Stations." *See Notice of Inquiry,* 57 FCC2d 580 (1976); *Memorandum Opinion and Order,* 60 FCC2d 858 (1976). Its conclusions there bear repeating in some detail. First, the Commission has reiterated its conclusion that it has no statutory authority to dictate entertainment formats. Format regulation, it is argued, is analogous to imposing common carrier responsibilities on broadcasters. Since Section 3(h) of the Communications Act, 47 U.S.C. § 153(h) (1970), specifically excludes broadcasters from the category of "common carriers," "Congress intentionally refrained from extending the full range of regulatory tools deemed appropriate for common carrier regulation to the field of broadcast regulation." *Memorandum Opinion and Order, supra,* 60 FCC2d at 859. In particular, "Congress did not enact [a] requirement that broadcasters receive Commission authority to commence or discontinue programming, including program format services, offered to the public." *Id.* This conclusion is further supported, in the Commission's view, by *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973), and *FCC v. Sanders Brothers Radio Station,* 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940). *See* 60 FCC2d at 860–861. A second point relevant here is the Commission's professed inability to determine the boundaries of a "particular entertainment format." *Id.* at 862. "The Commission does not know, as a matter of indwelling administrative expertise, whether a particular format is 'unique' or, indeed, assuming that it is, whether it has been deviated from by a licensee." *Id.* In any case, concludes

the Commission, "[i]t is impossible to determine whether consumers would be better off [with any particular format] without reference to the actual preferences of real people." *Id.* at 864.

If the Commission's own recently announced standards are applied to the rules challenged here, it seems clear that the rules cannot stand. The very essence of the feature film and sports rules is to require the permission of the Commission "to commence * * * programming, including program format services, offered to the public." However, it has been the consistent position of the Commission itself that cablecasters, like broadcasters, are not to be regulated as common carriers, a view sustained by a number of courts. *See, e. g., American Civil Liberties Union v. FCC, supra,* 523 F.2d at 1344; *Philadelphia Television Broadcasting Co. v. FCC,* 123 U.S.App. D.C. 298, 359 F.2d 282 (1966). Moreover, given the similarities between cablecasting operations and broadcasting, we seriously doubt that the Communications Act could be construed to give the Commission "regulatory tools" over cablecasting that it did not have over broadcasting. *See* 185 *U.S. App.D.C.* at —— ——, 567 *F.2d* at 27–28, *supra.* Thus, even if the siphoning rules might in some sense increase the public good, this consideration alone cannot justify the Commission's regulations. *See generally Hampton v. Mow Sun Wong, supra.*

In addition, the record before us is devoid of any "reference to the actual preferences of real people." While we would be willing to concede that certain formats, such as the World Series, are sufficiently unique and popular that a factual inquiry into actual preferences might not be required, this would not seem to be the case with either

n.4, 506 F.2d at 254 n. 4. In these circumstances, retention of WEFM's classical format raised no serious question of depriving other viewers of their favored formats and the proposed format change would only have added to an apparent surfeit of contemporary and rock music. Certainly a different case would have been presented were fewer stations involved (raising an issue of conflicts among the first prefer-

ences of viewers) or had WEFM proposed to offer another format in scarce supply.

In addition, even if *WEFM* did provide statutory authority to the Commission to act as it has here, the constitutionality of the jurisdiction thus conferred is a wholly separate issue, to be analyzed under the principles set out in Part III *infra.*

feature films or "non-specific" sports events.[50] Moreover, there is not even speculation in the record about what material would replace that which might be "siphoned" to cable television. Without such a comparative inquiry, we do not understand how the Commission could define the current level of programming as a baseline for adequate service. Finally, with regard to feature films we question how the Commission, which has stated that it has no criteria by which to distinguish among formats, could have determined that feature films are a sufficiently unique format to warrant protection. The record demonstrates that broadcasters are increasingly substituting made-for-television movies— for which "siphoning" is not a problem since the broadcasters own the copyrights— for feature films. *See, e. g., First Report and Order, supra,* 52 FCC2d at 26, JA 50. The inference from this would seem to be that the Commission has drawn its categories too narrowly and that a feature film rule may not really be necessary to ensure broadcast presentation of popular movie material. Whether or not this is the case, the inference is certainly too strong to be dismissed, as the Commission has done here, without discussion.

In analyzing the feature film and sports rules under the standards announced by the Commission in its broadcast format change proceeding, we do not wish to imply that we have reconsidered the position of this court in *WEFM.*[51] The sole purpose of undertaking this analysis is to demonstrate that the Commission has, in this proceeding, seemingly backed into an area of regulation in which it would not assert jurisdiction were it to face the issues directly. Indeed, in this very proceeding, and despite the

Commission's definition of current quantity and quality levels of films and sports events as the minimum level consistent with adequate television service, there is no indication that the Commission is prepared to require *broadcasters* to continue to present material presently on conventional television. *See* br. for respondent United States at 23; reply br. for petitioner Motion Picture Association of America at 3–4. In the absence of this court's opinion in *WEFM,* these unexplained inconsistencies in agency policy would require us to set aside the Commission's rules and remand the case to the agency to allow it to "supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Greater Boston Television Corp. v. FCC, supra,* 143 U.S.App. D.C. at 394, 444 F.2d at 852; *accord, New Castle County Airport Comm'n v. CAB,* 125 U.S.App.D.C. 268, 270, 371 F.2d 733, 735 (1966), *cert. denied,* 387 U.S. 930, 87 S.Ct. 2052, 18 L.Ed.2d 991 (1967). Because we understand the Commission's *Memorandum Opinion and Order* in the format change proceeding to constitute a request to this court to reconsider its position in *WEFM, see* 60 FCC2d at 865–866, and because we are hesitant to approve rules which seem inconsistent with the Commission's best thinking in a closely analogous area, we think we should not affirm the feature film and sports regulations on the basis of *WEFM.*

Before reaching a conclusion on whether remand is necessary, however, we must consider the Commission's second theory of jurisdiction.[52] Our analysis is hampered by the failure of the Commission to make clear its argument that Section 1 of the Communica-

---

**50.** Non-specific sports events are essentially those that occur during regular season play. *See First Report and Order, supra* note 2, 52 FCC2d at 59, JA 33.

**51.** As we have already indicated, *see* note 49 supra, *WEFM* only lends support to Commission jurisdiction and does not control it. Accordingly, there is no need for us to reconsider *WEFM.* Moreover, we decline to consider whether *WEFM* should be extended into the

cable television context since the Commission itself has argued that *WEFM* should be confined rather than extended.

**52.** In large part this argument appears to be a *post hoc* rationalization of counsel which, of course, could not provide a basis for sustaining the Commission. *See Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168–169, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).

tions Act,[53] as interpreted by this court in *NATO v. FCC, supra,* requires rules against "siphoning" of material away from free television. In the subscription broadcast proceeding the petitioning theater owners sought to block that part of the Commission's subscription television rules which permitted subscription television by arguing that Section 1 of the Act prohibited the Commission from withdrawing one channel from the broadcast spectrum for use by only the few who might be willing to pay for the privilege of receiving broadcast signals. *See First Report,* 23 FCC 532, 536–540 (1957). The Commission, in dismissing such an interpretation of the Act, stated:

> [Section 1 has] been relied on in support of an argument to the effect that the Act did not contemplate or permit, and in fact bars authorization by the Commission of a program service, by broadcast stations, which would be available only to such members of the public as were able and willing to pay a charge. We believe, however, that such a construction cannot reasonably be made of these excerpts. Section 1 states the general purposes of the Act in broad terms. The reference to "all the people of the United States" does not, for example, preclude licensing the use of radio frequencies for the safety and special radio services. Frequencies so allocated are not available to all the people of the United States. While the words "at reasonable charges" evidently refer to the Commission's regulation of rates charged by common carriers for message communications, and does not, presumably, refer to charges for programs disseminated over broadcast stations, it may be noted that this express reference to charges is unaccompanied by any prohibitive language concerning charges for programs transmitted by broadcast stations.

*Id.* at 538. In *NATO* this court, after reviewing the legislative history of the Communications Act, 136 U.S.App.D.C. at 358–360, 420 F.2d at 200–202, agreed, finding that the Act did not prohibit licensing of subscription television services, but was indeed "designed to foster diversity in the financial organization and *modus operandi* of broadcasting stations as well as in the content of programs * * *." 136 U.S. App.D.C. at 360, 420 F.2d at 202. Thus, as interpreted by both this court and the Commission, Section 1 does not itself compel the Commission to protect conventional advertiser-supported television broadcasting.

However, counsel for the Commission at oral argument appeared to be making a second argument about the meaning of Section 1. Stressing that Section 1 also mentions that the Commission is to foster "Nation-wide" service,[54] counsel argued that cable could not be a nationwide service in the reasonably foreseeable future and that "siphoning" would, therefore (the logic behind this "therefore" is by no means clear), destroy nationwide service in contravention of the policy of Section 1. *See* Transcript of Oral Argument at 57–58. We need not consider whether Section 1 can be so construed since counsel's argument is nothing more than a naked allegation, unsupported in the record. Indeed, the Commission has nowhere spelled out even a theory of the dynamic which could result in loss of broadcast television service to regions not served by cable. Nor is such a dynamic readily apparent. For example, cablecasters are unlikely to withhold feature film and sports material from markets they do not serve since broadcast of this material in such markets could not reduce the potential cable audience and because exhibition rights to this material would undoubtedly have substantial value. In these circumstances, the postulated loss of regional service is too

---

53. Section 1 provides in relevant part:

For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with ad-

equate facilities at reasonable charges, * * there is created a commission to be known as the "Federal Communications Commission" * * *.
47 U.S.C. § 151 (1970).

54. *See* note 53 *supra.*

speculative to support jurisdiction. *See City of Chicago v. FPC,* 147 U.S.App.D.C. 312, 323, 458 F.2d 731, 742 (1971), *cert. denied,* 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972).

Finally, none of the suggested bases for Commission jurisdiction justifies imposition of the no-advertising[55] and 90-percent[56] rules on cable television. These rules evolved out of the subscription broadcast television proceeding, *see Fourth Report and Order, supra,* 15 FCC2d at 484, and were retained here apparently because they raised "little dissent." *See First Report and Order, supra,* 52 FCC2d at 66, JA 90. The reasons for which these rules were adopted in the subscription television proceeding are not applicable here, however. In the subscription proceeding the Commission determined that the public interest would not be served if one of very few available broadcast channels was allocated to subscription television unless subscription television offered services distinct from conventional advertiser-supported broadcasting. *See* 15 FCC2d at 484. To ensure such a "supplemental" role for subscription television, advertising was prohibited and the broadcast time that could be allocated to sports and feature films—which were already available on conventional television—was limited to 90 percent of subscription broadcast time. When these rules were reviewed by this court, it was again in the context of a need to allocate scarce spectrum resources. *See NATO v. FCC, supra,* 136 U.S.App.D.C. at 365–366, 420 F.2d at 207–208. Such an allocation problem is clearly not involved in this case. Moreover, given the abundance of channels that cable systems can carry, plus the Commission's rules[57] requiring governmental, educational, and public access channels on every cable system carrying broadcast sig-

nals, we do not understand the need to restrict feature film and sports programming time to create the technical conditions for diversity. Without further explanation of the functions these rules are meant to serve, we cannot affirm the Commission's authority to promulgate them.

Although we hold today that the Commission has not established its jurisdiction on the record evidence before it, we think it important to note the limits of our holding. We do not hold that the Commission must find express statutory authority for its cable television regulations. Such a holding would be inconsistent with the nature of the FCC's organic Act and the flexibility needed to regulate a rapidly changing industry. However, we do require that at a minimum the Commission, in developing its cable television regulations, demonstrate that the objectives to be achieved by regulating cable television are also objectives for which the Commission could legitimately regulate the broadcast media. Where the First Amendment is involved, more will be required. *See* Part III *infra.* Further, we require that the Commission state clearly the harm which its regulations seek to remedy and its reasons for supposing that this harm exists. Because our holding is so limited, it is possible that the Commission will, after remand, be able to satisfy the jurisdictional prerequisites for regulating pay cable television. In order to avoid multiple remands, therefore, we will now consider other objections raised against these rules.

## B. *The Evidence*

### 1. *Standard of Review*

■ With the exception of the Commission's ruling in *In re Home Box Office, Inc.,*

---

**55.** No commercial advertising announcements shall be carried on subscription channels during such operations except before and after such programs for promotion of other programs for which a per-program or per-channel charge is made.

47 C.F.R. § 76.225(e) (1975), *as amended by Second Report and Order,* —— FCC2d ——, 35 P & F Radio Reg.2d 767 (1975).

**56.** Not more than ninety (90) percent of the total cablecast programming hours shall consist of feature films and sports events combined. * * *

47 C.F.R. § 76.225(d) (1975), *as amended by Second Report and Order,* —— FCC2d ——, 35 P & F Radio Reg.2d 767 (1975).

**57.** 47 C.F.R. §§ 76.251, 76.253 (1975).

51 FCC2d 317 (1975), JA 141, each of the orders challenged here is the product of rulemaking under Section 303 of the Communications Act, 47 U.S.C. § 303 (1970). Because the statute does not otherwise indicate, this rulemaking is also informal rulemaking governed by Section 4 of the Administrative Procedure Act (APA), 5 U.S.C. § 553 (1970), *see id.* § 553(a); *Ethyl Corp. v. EPA,* 176 U.S.App.D.C. 373, 405, 406, 541 F.2d 1, 33–34 (1976) (*en banc*), and the appropriate standard of review is that set out in Section 10 of the APA, 5 U.S.C. § 706(2)(A)–(D) (1970), *see Ethyl Corp. v. EPA, supra,* 176 U.S.App.D.C. at 405–406, 541 F.2d at 33–34; *National Ass'n of Food Chains, Inc. v. ICC,* 175 U.S.App.D.C. 346, 351–352, 535 F.2d 1308, 1313–1314 (1976). *See generally* Pedersen, *Formal Records and Informal Rulemaking,* 85 Yale L.J. 38 (1975); Wright, *The Courts and the Rulemaking Process: The Limits of Judicial Review,* 59 Cornell L.Rev. 375 (1974).

■ We have recently had occasion to review at length our obligation to set aside agency action which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law * * *," 5 U.S.C. § 706(2)(A), *see Ethyl Corp. v. EPA, supra,* 176 U.S.App.D.C. at 405–409, 541 F.2d at 33–37, and for this reason we need not labor our analysis here. It is axiomatic that we may not substitute our judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Yet our review must be "searching and careful," *id.,* and we must ensure both that the Commission has adequately considered all relevant factors, *see id.,* and that it has demonstrated a "rational connection between the facts found and the choice made," *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962).

■■ Equally important, an agency must comply with the procedures set out in Section 4 of the APA. *Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 417, 91 S.Ct. 814. The APA sets out three procedural requirements: notice of the proposed rulemaking, an opportunity for interested persons to comment, and "a concise general statement of [the] basis and purpose" of the rules ultimately adopted. 5 U.S.C. § 553(b)–(c). As interpreted by recent decisions of this court, these procedural requirements are intended to assist judicial review as well as to provide fair treatment for persons affected by a rule. *See Portland Cement Ass'n v. Ruckelshaus,* 158 U.S.App.D.C. 308, 326–327, 486 F.2d 375, 393–394 (1973), *cert. denied,* 417 U.S. 921 (1974); *International Harvester Co. v. Ruckelshaus,* 155 U.S.App.D.C. 411, 445, 478 F.2d 615, 649 (1973); *Automotive Parts & Accessories Ass'n v. Boyd,* 132 U.S.App.D.C. 200, 208, 407 F.2d 330, 338 (1968). *See also* Wright, *supra,* 59 Cornell L.Rev. at 380–381. To this end there must be an *exchange* of views, information, and criticism between interested persons and the agency. *See Portland Cement Ass'n v. Ruckelshaus, supra,* 158 U.S.App.D.C. at 326–327, 486 F.2d at 393–394; *cf. National Nutritional Foods Ass'n v. Weinberger,* 512 F.2d 688, 701 (2d Cir.), *cert. denied,* 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975). Consequently, the notice required by the APA, or information subsequently supplied to the public, must disclose in detail the thinking that has animated the form of a proposed rule and the data upon which that rule is based. *Portland Cement Ass'n v. Ruckelshaus, supra,* 158 U.S.App.D.C. at 325–327, 486 F.2d at 392–394; *International Harvester Co. v. Ruckelshaus, supra,* 155 U.S.App.D.C. at 445, 478 F.2d at 649. Moreover, a dialogue is a two-way street: the opportunity to comment is meaningless unless the agency responds to significant points [58] raised by

---

**58.** In determining what points are significant, the "arbitrary and capricious" standard of review must be kept in mind. Thus only comments which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule cast doubt on the reasonableness of a position taken by the agency. Moreover, comments which themselves are purely speculative and do not disclose the factual or policy basis on which they rest require no response. There must be some basis for thinking a posi-

the public. *Portland Cement Ass'n v. Ruckelshaus, supra,* 158 U.S.App.D.C. at 326–327, 486 F.2d at 393–394. A response is also mandated by *Overton Park,* which requires a reviewing court to assure itself that all relevant factors have been considered by the agency. *See* 401 U.S. at 416, 91 S.Ct. 814; *accord, Duquesne Light Co. v. EPA,* 522 F.2d 1186, 1196 (3d Cir. 1975), *vacated on other grounds,* 427 U.S. 902, 96 S.Ct. 3185, 49 L.Ed.2d 1196 (1976).

■ From this survey of the case law emerge two dominant principles. First, an agency proposing informal rulemaking has an obligation to make its views known to the public in a concrete and focused form so as to make criticism or formulation of alternatives possible. Second, the "concise and general" statement that must accompany the rules finally promulgated

> must be accommodated to the realities of judicial scrutiny, which do not contemplate that the court itself will, by a laborious examination of the record, formulate in the first instance the significant issues faced by the agency and articulate the rationale of their resolution. * * * [The record must] enable us to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them as it did.

*Automotive Parts & Accessories Ass'n v. Boyd, supra,* 132 U.S.App.D.C. at 208, 407 F.2d at 338; *accord, National Nutritional Foods Ass'n v. Weinberger, supra,* 512 F.2d at 701; *Pillai v. CAB,* 158 U.S.App.D.C. 239, 244–252, 485 F.2d 1018, 1023–1031 (1973); *National Air Carriers Ass'n v. CAB,* 141 U.S.App.D.C. 31, 44–45, 436 F.2d 185, 198–199 (1970); *cf. Camp v. Pitts,* 411 U.S. 138, 142–143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 420, 91 S.Ct. 814.

tion taken in opposition to the agency is true. *See Portland Cement Ass'n v. Ruckelshaus,* 158 U.S.App.D.C. 308, 326–327, 486 F.2d 375, 393–394 (1973).

## 2. Applying the Standard

### (a) The Need for Regulation

■ At the outset, we must consider whether the Commission has made out a case for undertaking rulemaking at all since a "regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist." *City of Chicago v. FPC, supra,* 147 U.S.App.D.C. at 323, 458 F.2d at 742. Here the Commission has framed the problem it is addressing as

> how cablecasting can best be regulated to provide a beneficial supplement to over-the-air broadcasting without at the same time undermining the continued operation of that "free" television service.

*Notice of Proposed Rule Making and Memorandum Opinion and Order, supra,* 35 FCC 2d at 898, JA 6. To state the problem this way, however, is to gloss over the fact that the Commission has in no way justified its position that cable television must be a supplement to, rather than an equal of, broadcast television. Such an artificial narrowing of the scope of the regulatory problem is itself arbitrary and capricious and is ground for reversal. *See Pillai v. CAB, supra,* 158 U.S.App.D.C. at 248, 485 F.2d at 1027. Moreover, by narrowing its discussion in this way the Commission has failed to crystallize what is in fact harmful about "siphoning." Sometimes the harm is characterized as selective bidding away of programming from conventional television, *see First Report and Order, supra,* 52 FCC 2d at 49, JA 73, sometimes delay, *see id.* at 50, JA 74, and sometimes (perhaps) the financial collapse of conventional broadcasting, *compare id.* at 45, JA 69, *with Second Report and Order, supra,* —— FCC 2d at ——, 35 P & F Radio Reg.2d at 772, JA 136. As a result, informed criticism has been precluded and formulation of alternatives stymied.[59]

**59.** This deficiency was brought to the attention of the Commission by, among others, the Justice Department:

> [B]efore the question posed [as to the existence of alternatives] can be answered, the Commission must define exactly what *public interests* it seeks to protect. Until such a

Setting aside the question whether siphoning is harmful to the public interest, we must next ask whether the record shows that siphoning will occur. The Commission assures us that siphoning is "real, not imagined." *First Report and Order, supra,* 52 FCC 2d at 50, JA 74. We find little comfort in this assurance, however, because the Commission has not directed our attention to any comments in a voluminous record which would support its statement. Moreover, whatever evidence the Commission thought it had was self-admittedly insufficient to give it a "clear picture as to the effects of subscription television upon conventional broadcasting." [60] *Id.* at 49, JA 73. Our own review of the *First Report* and the joint appendix filed in these cases suggests that, if there is any evidentiary support at all, it is indeed scanty. As to the potential financial power of cable television we are left to draw the inference from two facts—that championship boxing matches often appear only on closed-circuit television in theaters and that Evel Knievel chose to televise his jet-cycled dive into the Snake River in the same fashion—and a series of mathematical demonstrations. *See id.* at 9, JA 33. *See also Memorandum Opinion and Order, supra,* 23 FCC 2d at 828 n. 6 (Docket 18397) (reliance on mathematical demonstration). While the former may be directly relevant to siphoning of what the Commission has characterized as "specific" sports events, it is not at all clear what light they shed on the question of who is going to pay how much to see feature films and nonspecific sports events on pay cable.[61]

The meaning of the various mathematical demonstrations is even less certain. Petitioner American Broadcasting Companies, Inc., for example, has proposed the following technique for estimating the relative income available to cable and conventional television:

30. The most comprehensive attempt to develop a methodology for making this comparison is contained in the reply comments of the American Broadcasting

---

determination is made, the Commission cannot conclude whether there exists a "less restrictive" means of serving the public interest. To date, the Commission has not demonstrated exactly what public interest it advances by retarding pay cablecasting.

Comments of the Department of Justice in Docket No. 19554, at 26, JA 251 (Nov. 1, 1972) (emphasis in original).

**60.** The Commission's lack of a clear picture is directly attributable to its own choice to regulate rather than allow a period of unregulated experimentation in which data could be generated that could form a predicate for informed agency action. This decision was taken over the objections of a number of parties to this proceeding. *See, e.g.,* Reply Comments of the United States Department of Justice in Docket No. 19554, at 13, JA 280 (Oct. 4, 1974); Comments of Walter S. Baer, Henry Geller, and Leland L. Johnson in Docket No. 19554, at 11–14, JA 293–296 (Sept. 20, 1974). The sole basis for the Commission's choice to go forward is the conclusory statement that action was needed at a "'time when it involves no disruption of existing patterns.'" *First Report and Order, supra* note 2, 52 FCC 2d at 49, JA 73, *quoting Memorandum Opinion and Order,* 23 FCC 2d 825, 828 (1970) (Docket 18397). However, this position is precisely the opposite of that the Commission took in its *First Report and Order* in Docket 18397, 20 FCC 2d 201 (1969), *see* notes 5 & 27 *supra.* There the Commission expressly refused to impose regu-

lations like those challenged here until it gained "some further experience in this area." *Id.* at 204. In particular, the Commission noted that there was no "trend calling for action in the public interest," *id.,* and that the data developed in the subscription broadcast television proceeding was not apposite, *id.* The Commission has not called our attention to any data which would fill the gaps in its experience identified in 1969, and we can find none in the record.

In this state of affairs, where there is no evidence of any urgent need for preventive action and where approval of the Commission's position would foreclose the possibility that data could be generated in the future that would allow fully informed decisionmaking, we are disinclined to give the Commission the "benefit of the doubt" which it argues it should have. *See* br. for respondent FCC at 52–53.

**61.** Specific sports events are defined in the *First Report and Order, supra* note 2, 52 FCC 2d at 59–60, JA 83–84, and in 47 C.F.R. §§ 76.225(b)(1)–(b)(2) (1975). The record reveals that evidence relating to the siphoning of nonspecific sports events is scanty but that available data indicate "that there has been no interference with established over-the-air broadcasting patterns." Comments of Professional Baseball in Docket 19554, at 28, JA 1069 (Sept. 20, 1974).

Company. It there developed a formula for estimating the pay cable dollars available for the purchase of any particular program. The formula, in somewhat simplified terms, is as follows:

> (Total households) × (percent of households with tv sets) × (percent of households with tv sets that are cable tv subscribers) × (percent of cable tv subscribers that have pay cable option available) × (percent of subscribers with pay option that are pay subscribers) × (percent of pay subscribers that view program in question) × (charge to subscriber for program) × (percent of subscription charge passed through to program supplier) = (total national pay cable dollars available for the purchase of program in question).

ABC's own assumptions as to the state of the pay cable television industry in 1980 are as follows:

| | |
|---|---|
| Total household _____ | 75,400,000 |
| TV set penetration ___percent___ | 97 |
| CATV penetration _____do_____· | 35 |
| CATV penetration with pay TV potential _____do_____ | 80 |
| Pay subscriber penetration of systems with pay potential _____do_____ | 15 |
| Percent of pay subscribers viewing program _____do_____ | 50 |
| Charge to subscriber for program _____dollars___ | 2.25 |
| Percent of pay fee collected passed on to program producers ____percent___ | 35 |

In the circumstance posited by ABC, slightly more than 1.5 million homes would pay $2.25 each for a particular program making available slightly more tha[n] $1.2 million dollars to the pay cable industry for the purchase of the program in question. This, ABC suggests, compares with the $1.5 million dollars a network might pay for two showings of a "blockbuster" feature film like *Love Sto-*

ry during a five-year period, and with the $1 million dollars that might be paid for a movie of somewhat less appeal.

*First Report and Order, supra,* 52 FCC 2d at 9–10, JA 33–34. From this demonstration American Broadcasting Companies and other petitioners who presented similar mathematical models would draw the conclusion that

> [p]ay cable operations will have more money than television stations or television networks to purchase programming and, being creatures of a competitive economic system, will inevitably purchase much of the best programming now broadcast on free television and leave free television only with what is left over.
> * * *

*Id.* at 10, JA 34.

Even conceding the accuracy of the figures used (a concession which finds no support in the record, however), we think the proponents of the mathematical models have not proved their case. The problem is the incommensurability of the ultimate figures compared: nationwide income of pay cablecasters in 1980 on the one hand, and recent, but historical,[62] network expenditures on the other.[63] It seems patently obvious that no comparison is valid unless financial figures are extrapolated to the same year. More important is the potential for distortion introduced into the comparison by using *income* on one hand versus *expenditure* on the other. The Justice Department and other petitioners have repeatedly pointed out that the conventional television industry is highly concentrated and is, therefore, likely to enjoy substantial monopoly and monopsony power. *See, e. g.,* Comments of the United States Department of Justice in Docket No. 19554, at 20, JA 168 (April 7, 1969); Comments of the United States Department of Justice in

---

**62.** The precise date of network expenditure data is not clear. American Broadcasting Companies' presentation to the Commission used 1972 data. *See* Further Comments of American Broadcasting Companies, Inc. in Docket No. 19554, at 14, JA 698 (Sept. 20, 1974). In general, data contemporaneous with

the date of comment submission seem to have been used.

**63.** The deficiencies noted here were pointed out to the Commission in Comments of Optical Systems Corp. in Docket No. 19554, at 22, JA 1002 (Sept. 20, 1974).

Docket No. 19554, at 15–16, JA 194–195 (Sept. 5, 1969). Evidence consistent with such an inference is readily available. For example, Noll, Peck and McGowan report that television broadcast stations enjoyed a 20 percent return on sales in 1969 versus eight percent for all manufacturing industry [64] and suggest that this is evidence that "competition is less rigorous in television than elsewhere in the economy." [65] To be sure, television and manufacturing are very different industries, and had the Commission evaluated and rejected the arguments of the Justice Department and others a different question would be presented on this review. But the Commission did not consider whether conventional television broadcasters could pay more for feature film and sports material than at present without pushing their profits below a competitive return on investment and, consequently, it could not properly conclude that siphoning would occur because it could not know whether or how much· broadcasters, faced with competition, would increase their expenditures by reducing alleged monopoly profits. Since the Commission did not assess either potential distorting effect of the comparison offered by the broadcasters, any conclusion it may have drawn from this evidence would be arbitrary.

We have similar difficulties with the second cardinal assumption of the Commission, i. e., that "siphoning" would lead to loss of film and sports programming for audiences not served by cable systems or too poor to subscribe to pay cable. See Transcript of Oral Argument at 61–62; br. for respondent FCC at 53–54. To reach such a conclusion the Commission must assume that cable firms, once having purchased exhibition rights to a program, will not respond to market demand to sell the rights for viewing in those areas that cable firms do not reach. We find no discussion in the record supporting such an assumption. Indeed, a contrary assumption would

be more consistent with economic theory since it would prima facie be to the advantage of cable operators to sell broadcast rights to conventional television stations in regions of the country where no cable service existed. Moreover, the greater the area not covered by cable, the greater the demand would tend to be for broadcast rights, and the more likely it would be that, through a combination of cable and broadcast, nationwide coverage would be achieved.

We find the Commission's argument that "siphoning" could lead to loss of programming for those too poor to purchase cable television more plausible. Here again, however, we find that the Commission has not documented its case that the poor would be deprived of adequate television service and, worse, that the Commission, by prohibiting advertising in connection with subscription operations, has virtually ensured that the price of pay cable will never be within reach of the poor. There is little disagreement at the theoretical level about the mechanism through which the poor would be deprived of broadcast service in markets served by cable television. Cable operators, to be able to sell a show, would require exclusive exhibition rights in the markets they served, with the result that events purchased by cable operators for subscription presentation would be unavailable to broadcasters, or would be available only after a delay. What follows from this scenario, even assuming that cable operators would have the financial strength to outbid broadcasters, is by no means clear. There is uncontradicted evidence in the record, for example, that the popularity of film material does not decline with an increase in·the interval between first theater exhibition and first television broadcast. See Comments of Program Suppliers in Docket No. 19554, at 21, JA 386 (Nov. 1, 1972). At least as to movies, therefore, "siphoning" may not harm the poor very much.

---

**64.** R. Noll, M. Peck & J. McGowan, supra note 42, at 16. The National Association of Broadcasters has\ estimated that 1975 profit margins will average 18.9 percent. See Broadcasting, July 26, 1976, at 19.

**65.** R. Noll, M. Peck & J. McGowan, supra note 42, at 17.

Equally important, the pay cable rules taken as a whole scarcely demonstrate a consistent solicitude for the poor. Thus, although "free" home viewing relies upon advertiser-supported programming, the Commission has in this proceeding barred cable firms from offering advertising in connection with subscription operations. *See* note 55 *supra.* As a result, the Commission forecloses the possibility that some combination of user fees and advertising might make subscription cable television available to the poor, giving them access to the diverse programming cable may potentially bring. As has already been noted, *see* 185 U.S.App.D.C. at ——, 567 F.2d at 34, *supra,* the advertising ban section of the regulations was developed to meet wholly different regulatory problems and it has been retained here, not because of its intrinsic merit, but only because no one objected too much. We are thus left with the conclusion that, if the Commission is serious about helping the poor, its regulations are arbitrary; but if it is serious about its rules, it cannot really be relying on harm to the poor. Whatever may be the ultimate validity of this argument, its principal defect on this review is that there is no record evidence to support it.

### (b) *Consideration of Anticompetitive Effects*

■ Many petitioners, while not conceding the need for regulation, press a series of additional objections to the rules which col-

lectively represent a charge that the Commission has failed to consider anticompetitive effects of the regulatory strategy it has adopted. For analytic purposes the various theories of petitioners can be treated as two: first, a contention that the Commission has inadequately resolved traditional antitrust objections to the strengthening of broadcasters' monopsony power over the feature film and sports broadcasting industries; and, second, that the Commission has similarly been oblivious to the rules' negative impact on its otherwise long-standing policy favoring diversification of control of programming choices. We will treat these arguments seriatim.

Although much attention has been paid in brief to the question whether the Commission was obliged to consider traditional antitrust issues in formulating rules to be issued under its "public interest, convenience, or necessity" [66] standard, we do not think this precise issue is before us at this time. Throughout this proceeding the Commission has sought comments on the anticompetitive impact of its rules and has asked that less restrictive alternatives be presented to it. *Notice of Proposed Rulemaking and Memorandum Opinion and Order, supra,* 35 FCC 2d at 898 (¶ 12(b)), JA 6. The Commission, in its *First Report and Order,* also treated the antitrust issue as one which required an answer and properly stated the issue raised: [67] "whether the public interest considerations which under-

---

**66.** 47 U.S.C. § 303(r) (1970).

**67.** We do not agree with the suggestion of some petitioners that the Commission must demonstrate that the means it has chosen have the least impact on competition consistent with achievement of the Commission's purposes. To the extent that First Amendment and antitrust considerations coincide, it *is* necessary to make such a showing. *See* 185 U.S.App.D.C. at ——, 567 F.2d at 48, *infra.* Otherwise, we think our recent decision in *United States v. CAB,* 167 U.S.App.D.C. 313, 318–320, 511 F.2d 1315, 1320–1322 (1975), is controlling and requires rejection of a least restrictive alternative approach. In that case the Justice Department, advocating a least restrictive alternative approach, challenged CAB action under § 102 of the Federal Aviation Act, 49 U.S.C. § 1302

(1970), which expressly incorporates anticompetitive effect as one of six factors to be considered in assessing the "public convenience and necessity." The Department's argument was rebuffed in favor of a balancing approach on the basis of a number of precedents. Anticompetitive factors are also only one of a number of factors to be considered under the Communications Act, *see, e. g., National Broadcasting Co. v. United States,* 319 U.S. 190, 222–224, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); *FCC v. RCA Communications, Inc.,* 346 U.S. 86, 94, 73 S.Ct. 998, 97 L.Ed. 1470 (1953); *United States v. Radio Corp. of America,* 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959). Because of the similarity in statutory schemes, we think *United States v. CAB, supra,* controls our standard of review here.

lie the rules outweigh the public interest considerations in support of unfettered competition." 52 FCC 2d at 45, JA 69. Because the Commission has throughout these proceedings found the antitrust issue to be relevant to discharge of its public interest obligation,[68] the only issue properly before this court is whether the Commission met its obligation to make a record "enabl[ing] us to see \* \* \* why the agency reacted to [major issues of policy] as it did." *Automotive Parts & Accessories Ass'n v. Boyd, supra*, 132 U.S.App.D.C. at 208, 407 F.2d at 338; *see* 185 U.S.App.D.C. at ——, 567 F.2d at 36, *supra*. The short answer is: It did not.

We cannot fathom how the Commission reached the conclusion that the balance here should be struck in favor of regulation. Paragraph 150 of the *First Report and Order*, which contains the only discussion purporting to be an explanation, is obviously flawed and is completely irrelevant to most of the antitrust issues raised.[69] The Commission analogizes the regulatory problem here to that presented in *United States v. Southwestern Cable Co., supra*. This is simply incorrect. The exclusivity and distant signal rules reviewed there did not implicate questions of anticompetitive impacts on filmmakers or sports entrepreneurs and presented no occasion for an attempt to quantify or qualify the competitive harm resulting from reinforcing broadcasters' monopsony power over those industries. Nor did these rules address situations of alleged selective siphoning; the harm to be avoided was fragmentation of audiences leading to the financial demise of UHF and educational broadcasting. Economic harm in this sense is not at issue here, as the Commission itself recognizes. *See Memorandum Opinion and Order, supra*, 54 FCC

2d 800–802, JA 120–122 (¶¶ 10, 11, 18). *See also* 185 U.S.App.D.C. at ——, ——, 567 F.2d at 29, 36–37, *supra*. Moreover, even a cursory glance at the Supreme Court's opinion in *Southwestern Cable Co.* would show that the Court did not, contrary to the assertion of the Commission here, affirm the Commission's findings that anticompetitive effects could be tolerated because cable use of broadcast signals constituted "unfair competition" and consequently regulation was needed "to ameliorate the risk that the burgeoning CATV industry would have a future adverse impact on television broadcast service, both existing and potential \* \* \*." 52 FCC 2d at 45, JA 69. Instead the Court permitted regulation because it would further the congressionally approved goals of "significantly wider use \* \* \* of the available ultra-high-frequency channels," and of "encourage[ment of] \* \* \* sound and adequate programs to utilize the television channels now reserved for educational purposes." 392 U.S. at 174–175, 88 S.Ct. at 2004, *quoting* H.R.Rep.No. 1635, 89th Cong., 2d Sess. 7 (1966). Therefore, *Southwestern Cable Co.* certainly does not establish the proposition that "unfair competition" requires the general protection of broadcast television.

Even had the *Southwestern Cable Co.* Court approved the Commission's "unfair competition" argument, application of that argument to cablecasting rather than retransmission of broadcast signals is unsupportable. What was considered unfair by the Commission in the distant signal cases was that cable was competing with local broadcasters by bringing into the local area *identical* programming plucked out of the air from distant stations. Because local broadcasters had to pay copyright royalties for this material and cable did not, cable

---

68. There can be no question that the Commission can properly consider antitrust issues. *See, e. g., National Broadcasting Co. v. United States, supra* note 67, 319 U.S. at 222–224, 63 S.Ct. 997; *FCC v. RCA Communications, Inc., supra* note 67, 346 U.S. at 94, 73 S.Ct. 998; *United States v. Radio Corp. of America, supra* note 67, 358 U.S. at 351, 79 S.Ct. 457; *General*

*Telephone Co. of Southwest v. United States*, 449 F.2d 846 (5th Cir. 1971); *Nat'l Ass'n of Independent Television Producers & Distributors v. FCC*, 502 F.2d 249, 256 (2d Cir. 1974).

69. The Commission's own excellent summary of the antitrust and diversity issues presented can be found in the *First Report and Order, supra* note 2, 52 FCC 2d at 37–39, JA 61–63.

was thought to have an unfair advantage.[70] Here, however, cablecasters and broadcasters alike must pay copyright royalties, and there is no evidence that the cablecasting function is in any way subsidized by cable's broadcast retransmission function. Even if there were such evidence, reliance on the "unfair competition" argument would still be misplaced since any exaction of an indirect charge from pay cable operators to redress the alleged competitive imbalance would raise the costs of cable services which must be paid by home viewers, an effect that would disadvantage the poor, thereby undercutting the Commission's stated authority for promulgating the pay cable rules. *See* 185 U.S.App.D.C. at ——, 567 F.2d at 39–40, *supra*. Finally, we do not perceive any *public* benefit to be achieved by hobbling cable television to correct the sort of unfair competition alleged by the Commission.[71] The Supreme Court has found that cable's free use of broadcast signals does not affect the amount of compensation paid to copyright holders, *Teleprompter Corp. v. Columbia Broadcasting System, Inc.*, 415 U.S. 394, 412–413, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974), and there can

be no doubt that the absence of a charge "serve[s] the cause of promoting broad public availability of literature, music, and the other arts," *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156, 95 S.Ct. 2040, 2044, 45 L.Ed.2d 84 (1975).

■ We further agree with the Justice Department that the issue of the reasonableness of the balance struck between regulatory and competitive goals, where these diverge, is a matter to be tested on the basis of material in the rulemaking record, not on the basis of legal precedent. Because of this, we think it odd that the Department has not presented factual data to the Commission which would allow it to assess the likely effect of its rules on various fields of competition. The Department's arguments are basically speculative:[72] they are premised on the unverified assumption that enhancement of competition—actual or potential—is always a good.[73] Certainly there are no "specific findings" proposed, although the Department would impose such a standard on the Commission.[74] Indeed, the only argument

70. Under the recently amended Copyright Act cable operators will have to pay royalties for use of broadcast signals. *See* Pub.L.No. 94–553, § 111, 90 Stat. 2550–2558 (1976).

71. For this reason any Commission solicitude for the broadcast networks would be misplaced. *See FCC v. Sanders Bros. Radio Station*, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940); *Carroll Broadcasting Co. v. FCC*, 103 U.S.App.D.C. 346, 258 F.2d 440 (1958). Moreover, the network petitioners have shown no economic injury to them arising from cable's free use of broadcast signals, and we doubt that such a showing could be made. *See Teleprompter Corp. v. Columbia Broadcasting System, Inc.*, 415 U.S. 394, 412, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974) (fee broadcasters can charge is increased by the number of viewers added through cable retransmission).

72. In this respect the Department's arguments fall short of the standard of significance required to mandate a Commission rebuttal. *See* 185 U.S.App.D.C. at —— & note 58, 567 F.2d at 35 & note 58, *supra*.

73. Serious questions would be raised if the Commission sought to justify its rules solely on the basis of such a presumption. The Supreme

Court in *FCC v. RCA Communications, Inc.*, *supra* note 67, while recognizing that enhancement of competition was a relevant factor, reversed the Commission because it had not shown that "competition would serve some beneficial purpose." 346 U.S. at 97, 73 S.Ct. at 1005. Similarly, the Court has held that the Commission may not deny a license solely on the ground that a grant would facilitate or constitute an antitrust violation. *See United States v. Radio Corp. of America, supra* note 67. These cases would seem to stand for the proposition that the Commission may not assume that enhancement of competition is beneficial to the public interest unless it has examined the consequences of competition for the interest of listeners and viewers. *See also Citizens Committee to Save WEFM v. FCC*, 165 U.S.App.D.C. 185, 206, 506 F.2d 246, 267 (1974) (*en banc*).

74. We do not adopt the suggestion of the Justice Department and other petitioners that the Commission must make specific findings concerning anticompetitive effects and regulatory benefits before it can properly assess the antitrust issue. Cases cited in support of this proposition all involved agency adjudication or formal rulemaking in which a record is created

presented that rises above the speculative is one based on legal precedents, not fact—that a private agreement to accomplish the result dictated by the pay cable rules would be a boycott and unlawful *per se*. Br. of respondent United States at 19. Thus while we appreciate and salute the participation of the Justice Department in these proceedings, in the future a greater contribution could be made if the Department, which is, after all, the repository of antitrust expertise in the federal government, would work with the Commission in developing the type of data necessary to an informed decision.

Petitioners' second argument—that the pay cable rules consolidate network control over program production and selection and are, therefore, inconsistent with other Commission policy and, perhaps, the First Amendment—had more force prior to repeal of the series restrictions in the *Second Report and Order, supra*. We agree with petitioners that the series rule would have restricted the market for independently produced entertainment programming, thereby creating an effect directly contrary to that sought to be achieved in the Prime Time Access Rules proceedings.[75] As a result the series rules could not have been sustained on the record before us. *See Greater Boston Television Corp. v. FCC, supra*, 143 U.S.App.D.C. at 394, 444 F.2d at 852; *New Castle County Airport Comm'n v. CAB, supra*, 125 U.S.App.D.C. at 270, 371 F.2d at 735. The related argument of some petitioners that the rules will have the effect of reducing the economic feasibility of cablecasting minority-interest programming, and hence of reducing diversity, is plausible, but we cannot say on this record that the postulated effect is more than

speculative. Certainly an inquiry into this problem would be appropriate in any proceedings the Commission might have on remand. *Cf. Citizens Committee to Save WEFM v. FCC, supra.*

## III. FIRST AMENDMENT

More stringent, but substantially similar, rules to those adopted in the dockets under review here were upheld by this court in *NATO v. FCC, supra*, and it is wholly because of this precedent that the Commission believes the instant rules to be consistent with the First Amendment. *See First Report and Order, supra*, 52 FCC 2d at 44 (¶ 148), JA 68. Although we today reaffirm our holding in *NATO, see* Part V *infra*, we decline to extend *NATO* to Commission regulation of cable television since we find important differences between cable and broadcast television and "differences in the characteristics of new media justify differences in the First Amendment standards applied to them." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 386, 89 S.Ct. 1794, 1805, 23 L.Ed.2d 371 (1969).

Despite the novelty and complexity of the antisiphoning rules challenged in *NATO*, the constitutional question decided there was straightforward: whether a grant of a broadcast license could be conditioned on terms which made reference to "the kind and content of programs being offered to the public." 136 U.S.App.D.C. at 365, 420 F.2d at 207. Phrased this way, the issue could be readily resolved on the basis of time-tested and well-known theories of the First Amendment. "With everybody on the air," wrote Justice Frankfurter over 30 years ago, "nobody could be heard. * * * [T]he radio spectrum simply is not large enough to accommodate everybody. There is a fixed natural limitation upon the num-

---

under the strictures of rules of evidence and the standard of review is substantial evidence. Findings and a record of the type mandated in such proceedings are not generally required in informal rulemaking, and we see no need to differentiate between antitrust issues and all other issues in reviewing agency action.

**75.** *See Report and Order*, 23 FCC 2d 382, 384–395 (1970), *modified*, 25 FCC 2d 318 (1970), *further modified*, 44 FCC 2d 1081 (1974). In-

terestingly, the purpose of the Prime Time Access Rule was to help UHF television stations by increasing the supply of quality product. The series programming restriction, by working against this policy, therefore also worked against an outcome found vitally important by the Supreme Court in *United States v. Southwestern Cable Co., supra* note 24, a case the Commission has nonetheless invoked in support of its rulemaking authority here.

ber of stations that can operate without interfering with one another. Regulation of radio was therefore \* \* \* vital to its development \* \* \*." *National Broadcasting Co. v. United States,* 319 U.S. 190, 212–213, 63 S.Ct. 997, 1008, 87 L.Ed. 1344 (1943) (footnote omitted).[76] Although government division of the spectrum into discrete segments and subsequent allocation of those segments does not necessarily entail comparative licensing—for example, some have suggested that spectrum segments could be auctioned to the highest bidder,[77] thereby obviating the need for government control of the allocation process—the *National Broadcasting Co.* Court refused to restrict the Commission to the role of a "traffic officer, policing the wave lengths to prevent stations from interfering with each other." 319 U.S. at 215, 63 S.Ct. at 1009. Instead, the Court held it constitutionally permissible to allocate channels to " 'render the best practicable service to the community reached \* \* \*,' " *id.* at 216, 63 S.Ct. at 1009, *quoting FCC v. Sanders Bros. Radio Station, supra,* 309 U.S. at 475,

60 S.Ct. 693, and, because of the scarcity of broadcast facilities, this necessarily allowed "comparative considerations as to the [kind and content of program] services to be rendered \* \* \*," *id.* at 217, 63 S.Ct. at 1009; *see id.* at 226–227, 63 S.Ct. 997; *accord, Red Lion Broadcasting Co. v. FCC, supra,* 395 U.S. at 394, 89 S.Ct. 1794; *Gross v. FCC,* 480 F.2d 1288, 1291–1292 (2d Cir. 1973); *Carter Mountain Transmission Corp. v. FCC, supra,* 116 U.S.App.D.C. at 98, 321 F.2d at 364. Review of Commission deliberations culminating in the rules affirmed in *NATO* reveals plainly that the sole purpose of the subscription broadcast television inquiry and the pilot subscription television operations was to determine how to allocate television licenses so that the overall service rendered a community was the "best practicable." [78] Therefore, there was no need for *NATO* to break new First Amendment ground, and a reading of the *NATO* opinion will show that it did not do so.[79]

The First Amendment theory espoused in *National Broadcasting Co.* and reaffirmed in *Red Lion Broadcasting Co.* cannot be

**76.** See also *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 386–388, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); T. Emerson, *The System of Freedom of Expression* 660–667 (1970); Robinson, *The FCC and the First Amendment: Observations on 40 Years of Radio and Television Regulation,* 52 Minn.L.Rev. 67, 85–86 (1967). *But see* Kalven, *Broadcasting, Public Policy and the First Amendment,* 10 J.Law & Econ. 15, 30–32 (1967).

**77.** *See, e. g.,* Kalven, *supra* note 76, 10 J.Law & Econ. at 30–32.

**78.** *See generally Fourth Report and Order, supra* note 5.

**79.** The *NATO* court did not itself rely on *National Broadcasting Co.,* although the opinion as a whole is intended to be a response to the rather narrow question of the Commission's authority to allocate television channels to subscription stations. Nonetheless, the First Amendment discussion in *NATO* does recognize the scarcity rationale and cite cases which in turn rely on *National Broadcasting Co. See* 136 U.S.App.D.C. at 365 & n.35, 420 F.2d at 407 & n.35. Ultimately, however, primary reliance was placed on tests developed in *Banzhaf v. FCC,* 132 U.S.App.D.C. 14, 33–35, 405 F.2d 1082, 1101–1103 (1968), *cert. denied,* 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969), a case which affirmed the Commission's authori-

ty to order presentation of material rebutting cigarette commercials. *See* 136 U.S.App.D.C. at 366, 420 F.2d at 408. The First Amendment holding in *Banzhaf,* which relied on the commercial speech doctrine, has been limited by the subsequent cases of *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975), and *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), and would not in any case be directly applicable to suppression of film and sports programming. On the other hand, *Banzhaf's* requirements that ideas not be affected and that on balance diversity of expression be increased by regulation, applied by the *NATO* court, *see* 136 U.S.App.D.C. at 366, 420 F.2d at 408, come directly from *National Broadcasting Co., see* 319 U.S. at 226–227, 63 S.Ct. 997, and *Red Lion Broadcasting Co., see* 395 U.S. at 393, 89 S.Ct. 1794. Thus, if *NATO* moves beyond *National Broadcasting Co.* at all, it is only to the extent that it imposes the additional requirement that regulation increase diversity. *NATO*'s conclusion that the subscription broadcast television rules would increase diversity is not, however, transferable to the pay cable rules since any assessment of First Amendment gains and losses must be made on the basis of the record in front of us today and not on the basis of legal precedent.

directly applied to cable television since an essential precondition of that theory—physical interference and scarcity requiring an umpiring role for government—is absent.[80] Interference among speakers on a single cable is controlled by electrical equipment which divides the cable into channels and by the owners of the cable system who determine who shall have access to each channel and for how long. Nor is there any apparent physical scarcity of channels relative to the number of persons who may seek access to the cable system. Currently cable systems have the capacity to convey over 35 channels of programming. Technology is now available that would increase capacity to 80 channels, and in the future channel capacity may become unlimited. *See* br. for

80. The Commission in brief has argued that, regardless of the applicability of *NATO*, decisions affirming prior cable rules, including some applicable to cable systems that did not use broadcast signals, provide precedent for upholding the pay cable rules against a First Amendment attack. We think the Commission's reliance is misplaced, as a review of the cited cases will show. In some cases the First Amendment issue was simply not mentioned and may not even have been raised on review. *See, e. g., United States v. Midwest Video Corp.,* 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972); *United States v. Southwestern Cable Co., supra* note 24. In others the rationale was the scarcity argument developed in *National Broadcasting Co.* The earliest of these cable cases, *Carter Mountain Transmission Corp. v. FCC,* 116 U.S.App.D.C. 93, 321 F.2d 359, *cert. denied,* 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1963), did not in fact deal with regulation of cable television. It held simply that the Commission could deny a microwave license to a cable system operator for use in retransmitting broadcast signals in conjunction with cable television unless he agreed to use the licensed facility in a manner not endangering the economic health of broadcasters serving the same area. This principle is uncontroversial, *see FCC v. Sanders Bros. Radio Station, supra* note 71, 309 U.S. at 476, 60 S.Ct. 693, and was justified entirely on Justice Frankfurter's logic in *National Broadcasting Co. See* 116 U.S.App.D.C. at 98, 321 F.2d at 364. A similar fact situation was presented in *Idaho Microwave, Inc. v. FCC,* 122 U.S.App. D.C. 253, 352 F.2d 729 (1965). The subsequent case of *Buckeye Cablevision, Inc. v. FCC,* 128 U.S.App.D.C. 262, 387 F.2d 220 (1967), did involve application of Commission rules to a cable system that did not use microwave broadcast facilities. The issue presented was whether Commission rules prohibiting cable transmission of signals imported from distant broadcast stations (now codified at 47 C.F.R. §§ 76.51–76.161 (1975)) violated cable operators' First Amendment rights. In holding that the rules were constitutional the court, without discussion, cited *National Broadcasting Co.* and *Carter Mountain,* thus apparently incorrectly treating the case as one involving the scarcity and allocation rationale. *See* 128 U.S.App.D.C. at 267 n.23, 387 F.2d at 225 n.23. The Eighth Circuit, in passing on the same rules, cited *National Broadcasting Co.* and *Buckeye Cablevision* and similarly treated the issue as one indistinguishable from broadcasting:

> The Commission's [rules] regulating CATVs ha[ve] the same constitutional status under the First Amendment as regulation of the transmission of signals by the originating television stations. * * * The crucial consideration is that they do use radio signals * * *.

*Black Hills Video Corp. v. FCC,* 399 F.2d 65, 69 (8th Cir. 1968). Other cases cited by the Commission rely on various combinations of *National Broadcasting Co., Carter Mountain, Buckeye Cablevision,* or *Black Hills Video.* In these circumstances, the cited cases provide no independent support for the constitutionality of the pay cable rules.

To the extent that *Black Hills Video* stands for the proposition that the Commission in some sense "owns" the broadcast spectrum and can condition use of broadcast signals accordingly, it must be rejected. The public owns parks, sidewalks, and other "public forums," and yet it is beyond argument that use of such property by the public cannot be conditioned on whether the government agrees with or desires to allow or disallow the ideas which a speaker seeks to convey. *See, e. g., Police Department of Chicago v. Mosley,* 408 U.S. 92, 97–98, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); T. Emerson, *supra note 76,* at 660. Moreover, on the record before us there is no evidence that cablecasting and signal retransmission are not completely separate and distinct activities, *cf. Teleprompter Corp. v. Columbia Broadcasting System, Inc., supra* note 71, 415 U.S. at 405, 94 S.Ct. 1129 (no "nexus" between broadcast and retransmission functions); consequently any constitutionally permissible public control over broadcast signals is beside the point as justification for control of the cablecast function. Further, as we have already indicated, *see* note 44 *supra,* Commission power over recipients of broadcast signals would not extend to access cablecasters.

We express no opinion here on the question whether Commission control of microwave radio links used by cablecast networks would extend the Commission's constitutionally permitted authority over cable.

petitioner Home Box Office, Inc. at 9; Note, *Cable Television and Content Regulation: The FCC, the First Amendment and the Electronic Newspaper*, 51 N.Y.U.L.Rev. 133, 135 (1976). And even though there is some evidence that local distribution of cable signals is a natural economic monopoly,[81] which may raise the spectre of private censorship by the system owner, there is no readily apparent barrier of physical or electrical interference to operation of a number of cable systems in a given locality. In any case, scarcity which is the result solely of economic conditions is apparently insufficient to justify even limited government intrusion into the First Amendment rights of the conventional press, *see Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 247–256, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), and there is nothing in the record before us to suggest a constitutional distinction between cable television and newspapers on this point.[82]

The absence in cable television of the physical restraints of the electromagnetic spectrum does not, however, automatically lead to the conclusion that no regulation of cable television is valid.[83] As Professor Meiklejohn has eloquently demonstrated, *see* A. Meiklejohn, Political Freedom 24–48 (1960), rules restricting speech do not necessarily abridge freedom of speech. In particular, and regardless of the medium involved, regulations which transform cacophony into ordered presentation can often be consistent with the First Amendment since "the point of ultimate interest is not the words of the speakers, but the minds of the hearers," and the latter will not be affected unless each speaks in turn. *Id.* at 26; *see Red Lion Broadcasting Co. v. FCC, supra*, 395 U.S. at 387–388, 89 S.Ct. 1794. Further, because "the right of free speech * * * does not embrace a right to snuff out the free speech of others," *id.* at 387, 89 S.Ct. at 1805; *Associated Press v. United States*, 326 U.S.

**81.** See Cabinet Comm. on Cable Communications, *supra* note 21, at 10; *First Report and Order*, 20 FCC 2d 201, 222 n.27 (1969) (Docket No. 18397):

cable television's operations have developed on a noncompetitive, monopolistic basis in the particular areas served with no instance, to our knowledge, where a member of the public subscribes to more than one cable television service.

**82.** The Supreme Court in *Miami Herald* further found that the statute at issue would have had a. chilling effect on presentation of controversial material about public figures. *See* 418 U.S. at 256–258, 94 S.Ct. 2831. This suggests that the Court was concerned about an overall diminution of diversity. Whether rules seeking to reduce private control of scarce communications resources which did not have this effect would be valid thus appears to be an open question. A requirement that cable system operators dedicate certain channels to common carrier use might avoid such an infirmity and two courts, without reaching the First Amendment issue, have already indicated that the Commission could compel such sharing of cable channels. *See United States v. Midwest Video Corp., supra* note 80; *American Civil Liberties Union v. FCC*, 523 F.2d 1344, 1351 (9th Cir. 1975). Thus, on a proper record, *Miami Herald* might present no impediment to some types of Commission regulations.

Alternatively, local government involvement in the franchise and regulation of cable televi-

sion, *see* Promise Versus Performance, *supra* note 30, at 20-23, might make cable owners "the state" for constitutional purposes, thus subjecting them to First Amendment scrutiny. *Cf. Public Utilities Comm'n v. Pollak*, 343 U.S. 451, 462, 72 S.Ct. 813, 96 L.Ed. 1068 (1952); *Lehman v. City of Shaker Heights*, 418 U.S. 298, 303, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974); T. Emerson, *supra* note 76, at 663. Again, this question cannot be resolved on the record before us.

**83.** The existence of an alternative First Amendment theory justifying cable regulation is denied by many petitioners. Their argument, in summary, is that movies (and apparently sports events) are a form of speech protected by the First Amendment. *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952). Consequently the rules constitute a prior restraint .on protected speech which, if not always impermissible, *Times Film Corp. v. City of Chicago*, 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961), is presumptively invalid, *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963), and is here rebutted by no substantial purpose that could not be equally well served by less restrictive rules or is, in any event, invalid because the rules do not afford the procedural safeguards required by *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). This argument is not unpersuasive, but on reflection we do not think it fits the facts of this case.

1, 20, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), government may adopt reasonable regulations separating speakers competing and interfering with each other for the same audience. *See Red Lion Broadcasting Co. v. FCC, supra*, 395 U.S. at 387–389, 89 S.Ct. 1794. Restriction becomes abridgment only when government seeks to limit speech "because it is on one side of the issue rather than another," A. Meiklejohn, *supra*, at 27; *see Madison Joint School Dist. No. 8 v. Wisconsin Empl. Relations Comm'n*, 429 U.S. 167, 175, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976), or because it is thought unwise, unfair, false, or dangerous, *see, e. g., Police Department of Chicago v. Mosley*, 408 U.S. 92, 95–96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). *See generally* Wright, *Politics and the Constitution: Is Money Speech?*, 85 Yale L.J. 1001, 1005–1010 (1976). Certainly this is the broader teaching of *National Broadcasting Co., see* 319 U.S. at 215–218, 226–227, 63 S.Ct. 997, and it is a teaching relevant regardless of the source of conflict between speakers. *See Cox v. New Hampshire*, 312 U.S. 569, 576, 61 S.Ct. 762, 85 L.Ed. 1049 (1941) (government may regulate conflicting parades); *Kovacs v. Cooper*, 336 U.S. 77, 86, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (suggesting that government regulation of hecklers would be permissible).

 Similarly, the First Amendment does not bar regulation of the "collateral consequences" [84] or "collateral aspects" [85] of speech. For example, use of public places for speech-related purposes, although a right jealously guarded by the First Amendment,[86] is subject to reasonable restraints intended to ameliorate traffic congestion,[87] reduce noise to tolerable levels,[88] or prevent "capture" of unwilling audiences.[89] To be sure, many cases dealing with the collateral consequences of speech admit of analysis in terms of "speech" versus "conduct" or "pure speech" versus "speech plus." But the principle for which these cases stand cannot be limited to situations in which the evil arises because of motion unrelated to movement of the mouth and vocal cords. As the Supreme Court appears to have recognized (especially in cases dealing with symbolic speech),[90] conduct and speech can often be separated only in the eyes of the beholder and therefore First Amendment doctrines turning on the true "essence" of an expressive event can provide no very certain guide to judicial decision.[91] Instead, the important inquiry here, as in Meiklejohn's conflicting speaker situation, turns on the purpose for which government regulates. Regulations intended to curtail expression—either directly by banning speech because of a harm thought to stem from its communicative or persuasive effect on its intended audience, *see Spence v. Washington*, 418 U.S. 405, 411–

---

**84.** Kalven, *The Concept of the Public Forum: Cox v. Louisiana*, 1965 Sup.Ct.Rev. 1, 23.

**85.** Brennan, *The Supreme Court and the Meiklejohn Interpretation of the First Amendment*, 79 Harv.L.Rev. 1, 5 (1965).

**86.** *See, e. g., Police Department of Chicago v. Mosley, supra* note 80; *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). *See generally* Kalven, *supra* note 84.

**87.** *See, e. g., Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941).

**88.** *See Grayned v. City of Rockford, supra* note 86, 408 U.S. at 114–121, 92 S.Ct. 2294; *Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949).

**89.** *See, e. g., Lehman v. City of Shaker Heights, supra* note 82.

**90.** *See, e. g., Spence v. Washington*, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974); *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). *See also, Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) (applying collateral consequences analysis to prisoner mail censorship).

**91.** *See* Ely, *Flag Desecration: A Case Study in the Roles of Categorization and Balancing in First Amendment Analysis*, 88 Harv.L.Rev. 1482, 1493–1496 (1975). *Compare, e. g., Buckley v. Valeo*, 424 U.S. 1, 16, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), *with Buckley v. Valeo*, 171 U.S.App.D.C. 172, 191–195, 519 F.2d 821, 840–844 (1975) (en banc), *and* Wright, *Politics and the Constitution: Is Money Speech?*, 85 Yale L.J. 1001 (1976).

414 & n.8, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974); *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *United States v. O'Brien*, 391 U.S. 367, 382, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1953), or indirectly by favoring certain classes of speakers over others, *see Madison Joint School Dist. No. 8 v. Wisconsin Empl. Relations Comm'n, supra*, 429 U.S. at 175, 97 S.Ct. 421; *Buckley v. Valeo*, 424 U.S. 1, 17, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Police Department of Chicago v. Mosely, supra*, 408 U.S. at 97–98, 92 S.Ct. 2286; *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)—can be justified (if at all) only under categorization doctrines such as obscenity, "fighting words," or "clear and present danger." *See* Ely, *Flag Desecration: A Case Study in the Roles of Categorization and Balancing in First Amendment Analysis*, 88 Harv.L.Rev. 1482, 1496–1508 (1975). Regulations evincing a "governmental interest * * * unrelated to the suppression of free expression * * *," *United States v. O'Brien, supra*, 391 U.S. at 377, 88 S.Ct. at 1679, are treated differently, however. If such regulations "[1] further an important or substantial governmental interest; * * * and [2] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest," *id.* (brack-

eted numbers added), then the regulations are valid.[92]

Applying *O'Brien* here, we cannot say that the pay cable rules were intended to suppress free expression. The narrow purpose espoused by the Commission—protecting the viewing rights of those not served by cable or too poor to pay for cable—is neutral. Indeed, it is not unlike a regulation quieting hecklers or enforcing order on the radio spectrum. As in those situations, the conduct regulated would otherwise blot out transmission of a message, regardless of its content, to at least a segment of its potential audience. Also like those cases, both those whose conduct is restrained by the regulation and those who benefit by it have First Amendment rights, .although here the right is one to receive,[93] rather than transmit, information. True, unlike the heckler the person able to pay for cable television does not interrupt transmission of a message to. all who might hear it; specifically, he does not affect his own First Amendment rights or those of others served by cable. That only one segment of an audience benefits from the pay cable rules does not, however, at least in this case, require a different result for, as we shall now show, execution of the Commission's purpose in favoring one group would not necessarily deny material to the other or affect the range of ideas that are presented to either group.[94]

92. Although O'Brien was a case involving draft card burning, it has not been limited to that sort of symbolic speech situation. *See, e. g., Procunier v. Martinez, supra* note 90 (prisoners' mail); *A Quacker Action Group v. Morton*, 170 U.S.App.D.C. 124, 516 F.2d 717 (1975) (public gatherings at the White House). *See also Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 78–82, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (Powell, J., concurring) (obscenity zoning).

93. *See Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., supra* note 79, 425 U.S. at 756–757, 96 S.Ct. 1817; *Procunier v. Martinez, supra* note 90, 416 U.S. at 408–409, 94 S.Ct. 1800; *Kleindienst v. Mandel*, 408 U.S. 753, 762–763, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972); *Red Lion Broadcasting Co. v. FCC, supra* note 76, 395 U.S. at 390, 89 S.Ct. 1794.

94. Consequently, the pay cable rules, while equalizing access to the media for rich and poor, are not intended to have the effect proscribed in *Buckley v. Valeo*. *See* 424 U.S. at 17, 96 S.Ct. 612. For this reason we need not consider how to reconcile the Court's position in *Buckley* with the following flatly contradictory language in *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 123, 93 S.Ct. 2080, 2096, 36 L.Ed.2d 772 (1974):

The * * * public interest in providing access to the marketplace of "ideas and experiences" would scarcely be served by a system * * * heavily weighted in favor of the financially affluent, or those with access to wealth. * * *

*See also NATO v. FCC, supra* note 5, 136 U.S. App.D.C. at 365, 420 F.2d at 207.

The Commission seeks only to channel movie and sports material to its intended recipients over broadcast television, rather than pay cable, whenever the economics of advertiser-supported programming permit. If the rules and their associated waiver provisions [95] achieved no more than this—a proposition which will be examined in detail below—they would present no barrier: material suitable for broadcast would be broadcast; material financially viable only on cable would be on cable. Those served by pay cable would surely be served by broadcast television as well and, therefore, would have access to anything that could profitably be presented on either medium. Those without cable would at least be no worse off than at present. Conversely, the speech of movie and sports producers would not be affected because the regulations would not stand as a barrier to presentation of any material to one or both audiences.[96]

The speech of cablecasters, while undoubtedly inhibited, is similarly free from restrictions abridging freedom of expression. The rules clearly have no effect on traditional broadcast modes of persuasive speech such as news broadcasts or editorials. Nor do they affect films which the cablecaster has himself produced. Moreover, they do not even affect the cablecaster's ability to exhibit the work of others so long as no per-channel or per-program fee is charged. The sole effect of the rules is to prohibit the cablecaster from exhibiting for a separate fee the artistic work of others. Finally, no claim is made here that this narrow exclusion prevents the cablecaster from making an effective presentation of his views, nor for that matter is any claim made that cablecaster "endorsement" of the views of a particular film adds importantly to the message of the filmmaker.[97]

Despite our conclusion that content regulations are not at issue here, we nonetheless hold that the rules as promulgated and as put into effect by the Commission cannot be squared with *O'Brien's* other requirements and, consequently, they violate the First Amendment. The no-advertising [98]

**95.** The provision relating to movies is set out at note 46 *supra.* The waiver provisions for sports programming are less clear. The Commission makes no mention of any waiver policy with respect to specific sports events. On the other hand, cablecasters may seek a waiver of the non-specific sports rules if they can demonstrate that a reduction in broadcast presentation of such events has been caused by "reasons completely unrelated to program siphoning." *First Report and Order, supra* note 2, 52 FCC 2d at 62, JA 86.

**96.** A number of petitioners take the position that the rules reduce the overall profitability of feature films by restricting their commercial exploitation on both cable and broadcast television, with the result that fewer films are produced than would be the case in the absence of the rules. We do not think the record demonstrates such a causal connection between the rules and the overall health of the movie industry. But even if the rules did reduce the number of films produced, that effect would not rise to the level of a First Amendment violation. Such a result would prove too much. It would require invalidation of any general law which affected the profitability of the movie industry; this, however, is clearly not the law. *See, e. g., Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945).

**97.** That cablecasters might lose some profits by adopting these alternative modes of speaking is doubtless true. But in the absence of a showing of economic harm bordering on censorship, a diminution of profits does not itself present a First Amendment problem. *See* note 96 *supra. See also* the statement of the Supreme Court in rejecting the claim that motion picture "clearances" constituted violations of some theater owners' First Amendment rights:

The main contest is over the cream of the exhibition business—that of the first-run theatres. * * * [This] shows * * * that the question here is not *what* the public will see or *if* the public will be permitted to see certain features. It is clear that under the existing system the public will be denied access to none. * * * The central problem presented by these cases is which exhibitors get the highly profitable first-run business. That problem has important aspects under the Sherman Act. *But it bears only remotely, if at all, on any question of freedom of the press, save only as timeliness of release may be a factor of importance in specific situations.*

*United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 166–167, 68 S.Ct. 915, 933, 92 L.Ed. 1260 (1948) (last emphasis added).

**98.** *See* note 55 *supra.*

and 90-percent[99] rules clearly violate *O'Brien's* first criterion. Not only do they serve no "important or substantial \* \* \* interest," 391 U.S. at 377, 88 S.Ct. 1673, they serve no purpose which will withstand scrutiny on this record.[100] The sports and features films rules fare no better. We have already concluded that the Commission has not put itself in a position to know whether the alleged siphoning phenomenon is a real or merely a fanciful threat to those not served by cable.[101] Instead, the Commission has indulged in speculation and innuendo. *O'Brien* requires that "an important or substantial governmental interest" be demonstrated, however—a requirement which translates in the rulemaking context into a record that convincingly shows a problem to exist and that relates the proffered solution to the statutory mandate of the agency. The record before us fails on both scores. Moreover, we doubt that the Commission's interest in preventing delay of motion picture broadcasts could be shown to be important or substantial on any record.[102]

Finally, we think the strategy the Commission has pursued in implementing its interest in preventing siphoning creates a restriction "greater than is essential to the furtherance of that interest." *Id.* The Commission's approach to preserving the present quantity and quality levels of broadcast television has not been to set such levels directly. Instead, the Commission has sought to divide film and sports material into that suitable for broadcasting and that which can be shown, if at all, only on cable, and has left broadcasters free to choose from among the former without any competition from cable television. Even assuming that such a scheme is reasonable, a position contested by a number of petition-

ers, it is nonetheless very clear that, if such a strategy is to be used, the rules must be closely tailored to the end to be achieved so that material not broadcast (because it is unsuitable or unsalable) is readily available to cablecasters. Otherwise the rules will curtail the flow of programming to those served by cable and willing to pay for it, with a consequent loss of diversity and unnecessary restriction of the First Amendment rights of producers, cablecasters, and viewers.

In assessing whether the rules are sufficiently discriminating in dividing available material into that which may be cablecast and that which may not, the rules must be assessed without reference to the waiver provisions for two reasons. First, the Commission is on record that it will not freely grant waivers. *See In re Home Box Office, Inc., supra,* 51 FCC 2d at 322, JA 146. Second, the waiver procedures are fundamentally at odds with the procedures outlined in *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). We do not today hold that all the requirements of *Freedman* must be met, but certainly its central concern—that judicial proceedings be available for rapid removal of unwarranted prior restraints, 380 U.S. at 58–59, 85 S.Ct. 734—is applicable here.[103] *See Blount v. Rizzi,* 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971); *Illinois Citizens Committee for Broadcasting v. FCC,* 169 U.S.App.D.C. 166, 172, 515 F.2d 397, 403 (1975); *id.* at 183 & nn. 27, 29, 515 F.2d at 414 nn. 27, 29 (Bazelon, C. J., statement supporting rehearing *en banc* ). *See generally* Monaghan, *First Amendment "Due Process",* 83 Harv.L.Rev. 518 (1970). Manifestly, the waiver provisions are not reasonably calculated to provide a speedy determi-

---

**99.** *See* note 56 *supra.*

**100.** *See* 185 U.S.App.D.C. at ——, 567 F.2d at 34 *supra.*

**101.** *See* 185 U.S.App.D.C. at —— ——, 567 F.2d 36–40 *supra.*

**102.** The only evidence in the record before us relating to the effect of delay on the public interest is uncontradicted evidence showing that delay has *no effect* on the popularity of

feature film material. *See* Comments of Program Suppliers in Docket No. 19554, at 21, JA 386 (Nov. 1, 1972).

**103.** *This seems especially the case since the Commission tells us that delay is detrimental to the public interest. We are unaware of any evidence to support this proposition, however. See* note 102 *supra.*

nation by the Commission or the courts of whether a film may be shown on cable. In the only case we know of, *In re Home Box Office, Inc., supra,* it took the Commission alone six and a half months to process a waiver petition, and judicial review has taken an additional 19 months. It further appears that the minimum time in which a waiver could be decided by the Commission is 10 days since this is the length of time allowed for parties to file papers in opposition to waiver petitions. *See* 47 C.F.R. § 1.45(a) (1975). These time periods equal or exceed those which the Supreme Court has found unacceptable in other cases. *See, e. g., Carroll v. President & Comm'rs of Princess Anne,* 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968) (10 days); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (five-month delay after preliminary hearing).

Turning finally to the rules themselves, we agree with numerous petitioners that the rules are grossly overbroad. Examples of this are legion. It is undisputed, for example, that many films will never be suitable for broadcast television because of their limited appeal, their sophisticated subject matter, or their repeated releases to theaters. Yet, after a film is three years old its exhibition on cable television is restricted regardless of whether it was ever suitable for broadcast. Similarly, in some circumstances the sports rules have the anomalous effect of reducing the number of non-specific games that can be shown on cable television at the same time that broadcasters are reducing the number of games they will show. This provision is apparently justified on the ground that it is too difficult to monitor the reasons broadcasters cut back their game schedules and that at least some cutbacks might be caused by cable competition.[104] However, this record reveals no reason to think that cutbacks represent siphoning any more than they represent editorial or commercial judgment.

Where the First Amendment is concerned, creation of such a rebuttable presumption of siphoning without clear record support is simply impermissible. *Cf. Freedman v. Maryland, supra,* 380 U.S. at 58, 85 S.Ct. 734. Other examples could be cited, but this would only belabor points already extensively presented to the Commission. To provide guidance to the Commission for any proceedings it may have on remand, however, we conclude by reminding the Commission that prior restraints on speech are heavily disfavored and can be sustained only where the proponent of the restraint can convincingly demonstrate a need.

## IV. EX PARTE CONTACTS

During the pendency of this proceeding Mr. Henry Geller, a participant before the Commission and an *amicus* here, filed with the Commission a "Petition for Revision of Procedures or for Issuance of Notice of Inquiry or Proposed Rule Making."[105] Brief *amicus curiae* of Henry Geller at 1 (hereinafter Geller br.). In this petition *amicus* Geller sought to call the Commission's attention to what were alleged to be violations in these proceedings of the *ex parte* communications doctrine set out by this court in *Sangamon Valley Television Corp. v. United States,* 106 U.S.App.D.C. 30, 269 F.2d 221 (1959). The Commission took no action in response to the petition, and *amicus* now presses us to set aside the orders under review here because of procedural infirmity in their promulgation.

It is apparently uncontested that a number of participants before the Commission sought out individual commissioners or Commission employees for the purpose of discussing *ex parte* and in confidence the merits of the rules under review here. In fact, the Commission itself solicited such communications in its notices of proposed

---

**104.** *See First Report and Order, supra* note 2, 52 FCC 2d at 62, JA 86.

**105.** *Amicus* urged the Commission to set out the essence of any oral *ex parte* communications and place written presentations in the public file. In addition *amicus* urged that interested parties be allowed an opportunity to comment on the material disclosed on an expedited basis, *i. e.,* within a three-week period.

rulemaking [106] and, without discussing the nature, substance, or importance of what was said, argues before us that we should simply ignore these communications because *amicus'* petition was untimely, because *amicus* is estopped from complaining about a course of conduct in which he also participated, or, alternatively, because *Sangamon* does not apply.[107] In an attempt to clarify the facts this court *sua sponte* ordered the Commission to provide "a list of all of the *ex parte* presentations, together with the details of each, made to it, or to any of its members or representatives, during the rulemaking proceedings." In response to this order the Commission filed a document over 60 pages long which revealed, albeit imprecisely,[108] widespread *ex parte* communications involving virtually every party before this court, including *amicus* Geller.[109]

Unfortunately, the document filed with this court does not allow an assessment of what was said to the Commission by the various persons who engaged in *ex parte* contacts. To give a flavor of the effect of these contacts, however, we think it useful to quote at length from the brief of *amicus* Geller:

[*Ex parte*] presentations have in fact been made at crucial stages of the proceeding. Thus, in early 1974, then-Chairman Burch sought to complete action in this proceeding.[110] Because the Commission was "leaning" in its deliberations towards relaxing the existing rules "with 'wildcard' rights for 'blockbuster' movies," [111] American Broadcasting Company's representatives contacted "key members of Congress," who in turn successfully pressured the Commission not to take such action.[112] Further, in the final cru-

---

**106.** *See Notice of Proposed Rule Making and Memorandum Opinion and Order, supra* note 5, 35 FCC 2d at 899, JA 7; *Further Notice of Proposed Rule Making and Order for Oral Argument,* 48 FCC 2d 453, 463 (1974), JA 19.

**107.** The Commission has devoted only one footnote to this issue in its brief. Br. for respondent FCC at 50 n.55. This footnote does not challenge the accuracy of *amicus* Geller's statements and, indeed, offers us no facts at all that would tend to rebut the clear import of *amicus'* statements that *ex parte* contacts shaped the ultimate form of the pay cable rules. *See* text accompanying notes 110 to 116 *infra.*

The reasons urged by the Commission against reaching the *ex parte* contact issue are frivolous. There can be no waiver or estoppel raised here against our consideration of an issue vital to the public as a whole. Therefore, Mr. Geller's "dirty hands," if such they be, present no bar. Second, Mr. Geller sought a delay of only three weeks in which the public could comment on the information he urged be disclosed. Since he brought this matter to the attention of the Commission three *months* before issuance of the Commission's *First Report and Order,* and at a time when the Commission was still entertaining private communications, we find it incredible that the Commission would even suggest "the difficulty, if not the impossibility, of complying with this 'after the fact' request." Br. for respondent FCC at 50 n. 55. Finally, we hold that *Sangamon,* properly construed, does apply to this proceeding. *See* text at note 124 *infra.*

**108.** Because many Commission officials kept no accurate records on contacts, the list is incomplete and the dates of various contacts often uncertain or estimated.

**109.** *Ex parte* communications were also originated by many persons not party here, including members of Congress, members of the trade press, and representatives of various performing arts groups.

**110.** *See* Television Digest, March 4, 1974, at 1–2; Broadcasting, March 4, 1974, at 6; Television Digest, Feb. 18, 1974, at 1–2; Broadcasting, March 11, 1974, at 5.

**111.** Television Digest, March 4, 1974, at 2.

**112.** *Id.* (Senators' "action * * * was prompted by Hill visit by ABC Chairman Leonard Goldenson and President Elton Rule, whose only goal was to put halter on relaxation of pay-cable rules"); Broadcasting, March 4, 1974, at 6; *see* remarks by Everett H. Erlich, Senior Vice President and General Counsel, ABC, before the ABC Television Network Affiliates, Los Angeles, May 10, 1974, at 1:

As most of you know, the FCC just prior to Chairman Burch's sudden departure was on the verge of modifying Pay-TV rules applicable to movies by loosening the 2 and 10-years limitations. They were also considering a so-called "wild card" exception for 12 to 18 pictures a year which would have exempted entirely the most popular features from the application of any rule. We took the leadership in opposing these proposals with the result that key members of Congress made it

cial decisional period, the tentative course to be taken by the Commission would leak after each non-public meeting, and industry representatives would rush to make *ex parte* presentations to the Commissioners and staff. On March 10, 1975, the trade journals state that "word of last week's changes . . . · got out during the week, and both broadcast and cable lobbyists rushed to the Commission, unhappy with some facets" [113]—that broadcast representatives ". . . were calling on commissioners on Friday . . ." to oppose the changes. [114] The following week, the trade press again reported that "various [industry] groups lobbied the Commission, pressing for changes in the tentative decision" [115] —that National Association of Broadcasters ". . . staff members met with [FCC] Broadcast Bureau staffers to present data backing up [an] asserted need for [a more restrictive] standard." [116] Geller br. at 3–4 (footnotes edited and renumbered). It is important to note that many contacts occurred in the crucial period between the close of oral argument on October 25, 1974 and the adoption of the *First Report and Order* on March 20, 1975, when the rulemaking record should have been closed while the Commission was deciding what rules to promulgate. The information submitted to this court by the Commission indicates that during this period broadcast interests met some 18 times with Commission personnel, cable interests some nine times, motion picture and sports interests five times each, and "public interest" intervenors not at all.

Although it is impossible to draw any firm conclusions about the effect of *ex parte* presentations upon the ultimate shape of the pay cable rules, the evidence is certainly consistent with often-voiced claims of undue industry influence over Commission proceedings, and we are particularly concerned that the final shaping of the rules we are reviewing here may have been by compromise among the contending industry forces, rather than by exercise of the independent discretion in the public interest the Communications Act vests in individual commissioners. *Cf. National Ass'n of Independent Television Producers & Distributors v. FCC,* 502 F.2d 249, 257–258 (2d Cir. 1974). Our concern is heightened by the submission of the Commission's Broadcast Bureau to this court which states that in December 1974 broadcast representatives "described the kind of pay cable regulation that, in their view, broadcasters 'could live with.' " [117] If actual positions were not re-

---

known in no uncertain terms that they did not expect the Commission to acᵗ on such a far-reaching policy matter without guidance. The Commission got the message and has postponed for several months reconsideration of this particular issue * * *.

**113.** Television Digest, March 10, 1975, at 2; *see* Broadcasting, March 10, 1975, at 6.

**114.** *See id.*

**115.** Television Digest, March 17, 1975, at 3.

**116.** Broadcasting, March 17, 1975, at 10.

**117.** A similar note was struck by Chairman Wiley in a speech to the Federal Communications Bar Association:

There is one other lobbying technique which disturbs me although I would acknowledge that it is largely due to a somewhat unfortunate practice on the part of the FCC. · I mention it today because I want to put you on notice of my intention to change this practice wherever possible. When the Commission holds an oral argument on some rulemaking matter, we carefully divvy up the advocacy time available among various parties. When the argument is completed, the Commissioners should then be in the best position possible to make a tentative decision on the merits. Typically, however, such a decision is not made until long after the conclusion of the formal argument. During the delay until decision, oral argument often continues informally in the privacy of individual Commissioner and staff offices. I simply do not think that this is a good practice and, accordingly, and to the extent practicable, I hope to have the Commission making tentative judgments very quickly following oral argument, thus obviating the possibility of any further seriatim presentations.

* * * Compromises, fall-back positions, and the so-called "real facts" are often reserved for supplemental filings and, perhaps, subsequent visits to Commission offices. FCC Mimeo. 21343 at 4 (April 30, 1970).

vealed in public comments, as this statement would suggest, and, further, if the Commission relied on these apparently more candid private discussions in framing the final pay cable rules, then the elaborate public discussion in these dockets has been reduced to a sham.

■ Even the possibility that there is here one administrative record for the public and this court and another for the Commission and those "in the know" is intolerable. Whatever the law may have been in the past,[118] there can now be no doubt that implicit in the decision to treat the promulgation of rules as a "final" event in an ongoing process of administration is an assumption that an act of reasoned judgment has occurred, an assumption which further contemplates the existence of a body of material—documents, comments, transcripts, and statements in various forms declaring agency expertise or policy[119] —with reference to which such judgment was exercised. Against this material, "the full administrative record that was before [an agency official] at the time he made his decision," *Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 420, 91 S.Ct. at 825, it is the obligation of this court to test the actions of the Commission for arbitrariness or inconsistency with delegated authority. *See id.* at 415–416, 91 S.Ct. 814, 185 U.S.App.D.C. at ——– ——, 567 F.2d at 34–36, *supra.* Yet here agency secrecy stands between us and fulfillment of our obligation. As a practical matter, *Overton Park's* mandate means that the public record must reflect what representations were made to an agency so that relevant information supporting or refuting those representations may be brought to the attention of the reviewing courts by persons participating in agency proceedings. This course is obviously foreclosed if communications are made to the agency in secret and the agency itself does not disclose the information presented. Moreover, where, as here, an agency justifies its actions by reference only to information in the public file while failing to disclose the substance of other relevant information that has been presented to it, a reviewing court cannot presume that the agency has acted properly, *Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 415, 419–420, 91 S.Ct. 814; *see* K. Davis, Administrative Law of the Seventies § 11.00 at 317 (1976), but must treat the agency's justifications as a fictional account of the actual decisionmaking process and

---

**118.** The legislative history of the Administrative Procedure Act has been read to imply that there is no such thing as an administrative record in informal rulemaking. *See, e. g.,* U.S. Dept. of Justice, Attorney General's Manual on the Administrative Procedure Act 31 (1947) ("section 4(b) does not require the formulation of rules upon the exclusive basis of any 'record' made in informal rulemaking proceedings"). Professor Nathanson has similarly concluded:

> Section 553's notice-and-comment provisions were [originally] conceived of as instruments for the education of the administrator, especially on questions of policy; there is not the slightest indication that the purpose of the notice-and-comment proceeding was to develop a record by which a reviewing court could test the validity of the rule which the Administrator finally adopted.
>
> Apparently, an underlying assumption of the APA draftsmen was that any factual issues which became pertinent in a challenge to the validity of a section 553 rule would be resolved in the first instance in judicial proceedings—either in enforcement proceedings or in suits to enjoin enforcement. * * *

Nathanson, *Probing the Mind of the Administrator: Hearing Variations and Standards of Judicial Review Under the Administrative Procedure Act and Other Federal Statutes,* 75 Colum.L.Rev. 721, 754–755 (1975). The Department of Justice, in apparent accord with these views, relied on the Commission's own rules, which defined the administrative record to be comments and reply comments, and not the Administrative Procedure Act, in arguing that the *ex parte* contacts in *Sangamon* were invalid. *See* br. of the United States on remand from the Supreme Court at 5–10, *Sangamon Valley Television Corp. v. United States,* 106 U.S.App.D.C. 30, 269 F.2d 221 (1959). *See also* Verkuil, *Judicial Review of Informal Rulemaking,* 60 Va.L.Rev. 185, 202–205 (1974).

**119.** The precise content of this record is still a matter of some dispute. *Compare* Recommendation 74–4 of the Administrative Conference of the United States, *printed in* 3 Recommendations and Reports of the Administrative Conference of the United States 48–52 (1974), *with* Pederson, *Formal Records and Informal Rulemaking,* 85 Yale L.J. 38, 64–65 (1975).

must perforce find its actions arbitrary. *See Ruppert v. Washington,* 366 F.Supp. 686, 690 (D.D.C.1973), *aff'd by order,* 177 U.S.App.D.C. 270, 543 F.2d 417 (1976).

The failure of the public record in this proceeding to disclose all the information made available to the Commission is not the only inadequacy we find here. Even if the Commission had disclosed to this court the substance of what was said to it *ex parte,* it would still be difficult to judge the truth of what the Commission asserted it knew about the television industry because we would not have the benefit of an adversarial discussion among the parties. The importance of such discussion to the proper functioning of the agency decisionmaking and judicial review processes is evident in our cases.[120] We have insisted, for example, that information in agency files or consultants' reports which the agency has identified as relevant to the proceeding be disclosed to the parties for adversarial comment. Similarly, we have required agencies to set out their thinking in notices of proposed rulemaking. This requirement not only allows adversarial critique of the agency but is perhaps one of the few ways that the public may be apprised of what the agency thinks it knows in its capacity as a repository of expert opinion.[121] From a functional standpoint, we see no difference between assertions of fact and expert opinion tendered by the public, as here, and that generated internally in an agency: each may be biased, inaccurate, or incomplete—failings which adversary comment may illuminate. Indeed, the potential for bias in private presentations in rulemakings which resolve "conflicting private claims to a valuable privilege," *Sangamon Valley Television Corp. v. United States, supra,* 106 U.S. App.D.C. at 33, 269 F.2d at 224, seems to us greater than in cases where we have reversed agencies for failure to disclose internal studies. We do not understand the rulemaking procedures adopted by the Commission to be inconsistent with these views since those procedures provide for a dialogue among interested parties through provisions for comment, reply-comment, and subsequent oral argument.[122] What we

---

**120.** *See* 185 U.S.App.D.C. at ———, 567 F.2d at 34–36 *supra.*

**121.** For an example of agency disclosure of expertise in a notice of proposed rulemaking, *see Environmental Defense Fund, Inc. v. EPA,* 179 U.S.App.D.C. 43, 52, 548 F.2d 998, 1007 (1976).

**122.** The Commission's rules provide in relevant part:

§ 1.415 Comments and replies.

(a) After notice of proposed rule making is issued, the Commission will afford interested persons an opportunity to participate in the rule making proceeding through submission of written data, views, or arguments, with or without opportunity to present the same orally in any manner.

(b) A reasonable time will be provided for submission of comments in support of or in opposition to proposed rules, and the time provided will be specified in the notice of proposed rule making.

(c) A reasonable time will be provided for filing comments in reply to the original comments, and the time provided will be specified in the notice of proposed rule making.

(d) No additional comments may be filed unless specifically requested or authorized by the Commission.

(e) For time limits for filing motions for extension of time for filing comments or reply comments, see § 146(b).

47 C.F.R. § 1.415 (1975). Substantially similar rules were construed in *Sangamon Valley Television Corp. v. United States, supra* note 118, 106 U.S.App.D.C. at 33–34, 269 F.2d at 224–225, to prohibit *ex parte* communications since such communications, as a practical matter, constituted additional comments for which no specific authority had been granted. *See* 47 C.F.R. § 1.415(d) (1975). At the time of *Sangamon,* however, the Commission's rules and practice required "a showing of good cause," 106 U.S.App.D.C. at 34, 269 F.2d at 225, for approval of a request to submit additional comments. In the absence of this language, and given the apparent long-standing Commission interpretation of its own rules to allow *ex parte* contacts, *see* Geller br. at 7, the inference that the Commission has violated its own rules is less easy to draw from the rather obvious inconsistency between the published rules' strict timetable for comment and the actual practice of allowing comment at any time. Nonetheless, the Commission's practice of announcing a relaxation in its comment and reply-comment rules through the cryptic phrase, "[i]n reaching a decision in this matter, the Commission may take into account any other relevant information before it," 35 FCC 2d at 899, JA 7, is certainly inconsistent with the spirit of the poli-

do find baffling is why the Commission, which apparently recognizes that ready availability of private contacts saps the efficacy of the public proceedings,[123] nonetheless continues the practice of allowing public and private comments to exist side by side.

 Equally important is the inconsistency of secrecy with fundamental notions of fairness implicit in due process and with the ideal of reasoned decisionmaking on the merits which undergirds all of our administrative law. This inconsistency was recognized in *Sangamon,* and we would have thought that the principles announced there so clearly governed the instant proceeding

that there could be no question of the impropriety of *ex parte* contacts here. Certainly any ambiguity in how *Sangamon* should be interpreted has been removed by recent congressional and presidential actions.[124] In the Government in the Sunshine Act, for example, Congress has declared it to be "the policy of the United States that the public is entitled to the fullest practicable information regarding the decisionmaking processes of the Federal Government," Pub.L.No. 94–409, § 2, 90 Stat. 1241 (Sept. 13, 1976), and has taken steps to guard against *ex parte* contacts in formal agency proceedings.[125] Perhaps more closely on point is Executive Order

---

cy disclosure requirements of the Freedom of Information Act, 5 U.S.C. § 552(a)(2)(B) (1970), which seek to give the public an understanding of how an agency actually works. One not familiar with Commission practices would be hard put to understand that the foregoing phrase effectively repealed 47 C.F.R. § 1.415(d), a fact corroborated by the complete absence of reported *ex parte* contacts from public interest intervenors other than *amicus* Geller, himself a former General Counsel of the Commission. In these circumstances, we do not think the Commission can be said to have specifically authorized additional comments as required by 47 C.F.R. § 1.415(d), *cf.* 5 U.S.C. § 552(a)(2) (prohibiting agency reliance on undisclosed policy statements), and we therefore hold that the Commission violated its own rules.

123. I[t] seems to me that [a procedure prohibiting *ex parte* contacts] will also have a salutary effect on the level of advocacy during arguments before the Commission. I have often felt that we don't learn as much during oral proceedings as we would [*sic*]. Many oral presentations are not only repetitious * * * but also, if I may say so, fairly "hard-line". Compromises, fall-back positions, and the so-called "real facts" are often reserved for supplemental filings and, perhaps, subsequent visits to Commission offices.

Under my proposed procedures, if you decide to hard-line it, you had better be convincing—otherwise, you might just find that we decided to adopt your opponent's equally hard-line position. Hopefully, however, you can better utilize the opportunity of oral argument to avoid needless repetition, to perhaps zero in on a particularly important aspect of the case and, finally, to provide the Commission with some alternative solutions assuming, just assuming, that your proposed recommendation is not fully adopted.
Remarks of Richard E. Wiley, Chairman, FCC, FCC Mimeo. 21343 (April 30, 1974).

124. For this reason, we do not think our opinion in *Courtaulds (Alabama) Inc. v. Dixon,* 111 U.S.App.D.C. 115, 294 F.2d 899 (1961), should be interpreted to narrow *Sangamon.* In *Courtaulds* it was stipulated that the Federal Trade Commission had considered *ex parte* communications in formulating its final rules defining rayon. 111 U.S.App.D.C. at 120, 294 F.2d at 904. Nonetheless, in upholding the procedures used this court said, "We find no evidence that the Commission improperly did anything in secret or gave to any interested party advantages not shared by all." 111 U.S.App.D.C. at 120–121, 294 F.2d at 904–905. This finding alone distinguishes *Courtaulds* from both *Sangamon* and the instant case, in both of which the substance of the contacts was kept secret. Indeed, the *Courtaulds* court specifically noted that *ex parte* submissions were "canvassed with the appellant, Government spokesmen and others * * *." 111 U.S.App.D.C. at 120, 294 F.2d at 904. *Courtaulds* also contained a footnote distinguishing *Sangamon* on the ground that the rulemaking in *Courtaulds* did not decide competing private claims to a valuable privilege. 111 U.S.App.D.C. at 120–121 n.16, 294 F.2d at 904–905 n.16.

To the extent this same footnote also suggests that *Sangamon* did not involve rulemaking, it is plainly in error. *See Sangamon Valley Television Corp. v. United States, supra* note 118, 106 U.S.App.D.C. at 33, 269 F.2d at 224. Nor, as the Commission suggests here, was *Sangamon* limited to "quasi-judicial" proceedings.

125. Of course, the Sunshine Act by its terms does not apply here. Its *ex parte* contact provisions are couched as an amendment to 5 U.S.C. § 557, and as such the rules do not apply to rulemaking under § 4 of the Administrative Procedure Act, 5 U.S.C. § 553. Moreover, the Act was not in effect at the time of the events in question here.

11920, 12 Weekly Comp. of Presidential Documents 1040 (1976), which prohibits *ex parte* contacts with members of the White House staff by those seeking to influence allocation of international air routes during the time route certifications are before the President for his approval.[126] The President's actions under Section 801 of the Federal Aviation Act [127] are clearly not adjudication, nor even quasi-judicial. Instead, the closest analogue is precisely that of *Sangamon*: informal official action allocating valuable privileges among competing private parties. Thus this is a time when all branches of government have taken steps "designed to better assure fairness and to avoid suspicions of impropriety," White House Fact Sheet on Executive Order 11920 (June 10, 1976), and consequently we have no hesitation in concluding with *Sangamon* that due process requires us to set aside the Commission's rules here.[128]

 From what has been said above, it should be clear that information gathered *ex parte* from the public which becomes relevant to a rulemaking will have to be disclosed at some time. On the other hand, we recognize that informal contacts between agencies and the public are the "bread and butter" of the process of administration and are completely appropriate so long as they do not frustrate judicial review or raise serious questions of fairness. Reconciliation of these considerations in a manner which will reduce procedural uncertainty leads us to conclude that communications which are received prior to issuance of a formal notice of rulemaking do not, in general, have to be put in a public file. Of course, if the information contained in such a communication forms the basis for agency action, then, under well established principles,[129] that information must be disclosed to the public in some form. Once a notice of proposed rulemaking has been issued, however, any agency official or employee who is or may reasonably be expected to be involved in the decisional process of the rulemaking proceeding, should "refus[e] to discuss matters relating to the disposition of a [rulemaking proceeding] with any interested private party, or an attorney or agent for any such party, prior to the [agency's] decision * * *," Executive Order 11920, § 4, *supra*, at 1041. If *ex parte* contacts nonetheless occur, we think that any written document or a summary of any oral communication must be placed in the public file established for each rulemaking docket immediately after the communication is received so that interested parties may comment thereon. *Compare* Executive Order 11920, § 5, *supra*.[130]

---

**126.** Sec. 4. Individuals within the Executive Office of the President shall follow a policy of (a) refusing to discuss matters relating to the disposition of a case subject to the approval of the President under section 801 with any interested private party, or an attorney or agent for any such party, prior to the President's decision, and (b) referring any written communication from an interested private party, or an attorney or agent for any such party, to the appropriate department or agency outside of the Executive Office of the President. * * *

Sec. 5. Departments and agencies outside of the Executive Office of the President which regularly make recommendations to the President in connection with the Presidential review pursuant to section 801 shall * * *:

(a) establish public dockets for all written communications (other than those requiring confidential treatment for defense or foreign policy reasons) between their officers and employees and private parties in connection with the preparation of such recommendations[.]

Executive Order 11920, 12 Weekly Comp. of Presidential Documents 1040, 1041 (1976).

**127.** 49 U.S.C. § 1461 (Supp. V 1974).

**128.** For additional views favoring extension of the *ex parte* prohibition of the Sunshine Act to informal rulemaking, *see* Ass'n of the City of New York, Government in the Sunshine Act, *reprinted in Hearings on H.R. 10315 & H.R. 9868 before the House Committee on Government Operations*, 94th Cong., 1st Sess. 254–257 (1975), and *Hearings on the Open Communications Act of 1975, S. 1289, before the Subcomm. on Administrative Prac. & Proc. of the Senate Comm. on the Judiciary*, 94th Cong., 1st Sess. (1976).

**129.** *See* 185 U.S.App.D.C. at ——, 567 F.2d 35–36, *supra*.

**130.** We do not think these reporting requirements will be unduly burdensome. The overall

■ For the foregoing reasons, we must consider what steps should be taken to cure the procedural defect introduced by *ex parte* contacts. One option would be simply to vacate all of the rules under review and remand them to the Commission for consideration *de novo*. This approach has two defects, however. First, it is not possible for us to expunge from the Commission's collective memory what was said to it *ex parte*. Consequently, information untested by public scrutiny could influence the outcome of future proceedings if steps are not now taken to put this information on the public record. Second, as discussed in Part V *infra*, we find it possible to uphold the Commission's rules relating to subscription broadcast television on the basis of the public record as it now stands. We further find no indication in the material already submitted to this court that the subscription broadcast rule amendments benefit persons who participated in *ex parte* contacts. We think the subscription broadcast rules ought, therefore, to remain in effect pending clarification of what was said to the Commission *ex parte*. Such clarification would, of course, require further proceedings to be held to determine what was said to the Commission. Since it does not seem possible for such an inquiry to be limited solely to contacts regarding subscription broadcast television given the overlap between issues and parties in these proceedings, and because it would be useful to remove any possible effect of the *ex parte* contacts in these proceedings, we think the best resolution of the procedural problem we face is to adopt the course taken in *Sangamon* itself. Therefore, we today remand the record to the Commission for supplementation with instructions "to hold, with the aid of a specially appointed hearing examiner, an evidential hearing to determine the nature and source of all *ex parte* pleas and other approaches that were made to" the Commission or its employees after the issuance of the first notice of proposed rulemaking in these dockets. 106 U.S.App.D.C. at 34, 269 F.2d at 225. "All parties to the former proceeding and to the present review may on request participate

effect of our opinion will be to require procedures similar to those already in effect in the Consumer Product Safety Commission which the head of that Commission has stated are not burdensome. *See Hearings, supra* note 128, at 10–39 (statement of Richard O. Simpson, Chairman, Consumer Product Safety Commission). Nor do we think disclosure will have the effect of cutting off information vital to the rulemaking process. *See id.* at 58 (testimony of Dr. Alexander Schmidt, Commissioner of Food and Drugs); *id.* at 170, 172 (statement of Bruce Brennan, Vice President, Pharmaceutical Manufacturers Ass'n). The scheme we require here is also no more burdensome than that required by the Sunshine Act for formal rulemaking, *see* 5 U.S.C. § 557(d)(1)(C) *as amended*, or by Executive Order 11920, *see* note 126 *supra*. In addition, agency compliance with this opinion would be in accordance with Recommendations 74–4 of the Administrative Conference of the United States which provides:

1. In the absence of a specific statutory requirement to the contrary, the following are the administrative materials that should be before a court for its use in evaluating, on preenforcement judicial review, the factual basis for rules adopted pursuant to informal procedures prescribed in 5 U.S.C. § 553: (1) the notice of proposed rulemaking and any documents referred to therein; (2) comments and other documents submitted by interested persons; (3) any transcripts of oral presentations made in the course of the rulemaking; (4) *factual information not included in the foregoing that was considered by the authority responsible for promulgation of the rule or that is proffered by the agency as pertinent to the rule*; (5) reports of any advisory committees; and (6) the agency's concise general statement or final order and any documents referred to therein. References to the "record" or "whole record" in statutes pertaining to judicial review of rules adopted under Section 553 should be construed as references to the foregoing in the absence of a legislative intent to the contrary. The Conference does not assume that the reviewing court should invariably be confined to the foregoing materials in evaluating the factual basis for the rule.

3 Recommendations & Reports of the Administrative Conference of the United States 49 (1974) (emphasis added; footnote omitted).

Despite what has been said above, it is conceivable that trade secrets or information affecting national defense, if proffered as the basis for rulemaking, should be kept secret. *Cf.* 5 U.S.C. § 552. We do not think any such issue is before us today, and it will be time enough to determine the bounds of any exemption from disclosure when a proper case is presented.

fully in the evidential hearing," *id.*, and may further participate in any proceedings before the Commission which it may hold for the purpose of evaluating the report of the hearing examiner. The Commission is further instructed to file the supplemented record with this court within 120 days of the date of this opinion, together with its recommendations concerning our disposition of the subscription broadcast television segment of this review.

## V. SUBSCRIPTION BROADCAST TELEVISION

■ Over six years ago this court rendered its decision in *NATO v. FCC, supra*, affirming in all respects subscription broadcast television rules promulgated in the Commission's *Fourth Report and Order*.[131] That inquiry, unlike the subscription broadcast rules here under review, was based on elaborate data generated in a two-year trial of subscription broadcast television in Hartford, Connecticut. Since *NATO* it appears that few, if any, subscription broadcast stations have begun operation on a commercial basis, and consequently the best information available about the general effect of subscription television on conventional broadcasting is that in the *Fourth Report*. Because of these essentially static factual circumstances, it would be inappropriate for us to reopen now questions of the overall rationality of anti-siphoning rules as they pertain to subscription broadcast television and, as a result, we agree with a number of petitioners that the only question for review here is the rationality of the amendments to the subscription broadcast television rules announced in Dockets 18397 and 19554. We further hold that *NATO* fore-

closes general antitrust and First Amendment objections to the subscription broadcast television rules.

The differences between the rules passed on in *NATO* and the present subscription broadcast rules can be quickly summarized. The no-advertising and 90-percent rules remain unchanged. The feature film rules allow an additional year of unrestricted subscription broadcasting after general release and generally relax requirements for subscription broadcasting of films over ten years old.[132] In addition, foreign language films are no longer covered by the rules and the criterion for subscription showing of films three to ten years old has been modified to allow exhibition when a conventional broadcaster in the market holds a present contractual right to exhibit the film. The rule prohibiting subscription exhibition of series programming[133] has been dropped. The sports rules have also been modified; however, no one here challenges the sports rules as applied to subscription broadcast television.

We turn first to the feature film rules. There is ample evidence in the record supporting the Commission's conclusion that "[f]ew films are televised before they are three years old, and most are four years or older before their first telecast." *First Report and Order, supra*, 52 FCC 2d at 51, JA 75. In particular, we note the extensive surveys of the program suppliers which suggest that the average age of films shown on broadcast television is over five years.[134] Therefore the Commission's further conclusion that the period of subscription viewing of feature films could be extended to three years from date of release without affecting broadcasting exhibition

---

**131.** 15 FCC 2d 466 (1968); *see* 185 U.S.App. D.C. at ——, 567 F.2d at 20–21, *supra*.

**132.** Originally films could be freely shown only until two years after general release. *Id.* at 597. Films over ten years old could be shown once per month without consulting the Commission. *Id.* Other films could be shown if the Commission was convinced either that they had been offered to broadcast television and refused or that they were unsuitable for broadcast use. *Id.* Since the effect of the present rules is only to delineate certain classes of films

as presumptively unsuitable for or unwanted by broadcast television, it is not clear how much practical difference there would be between the operational impacts of the two rules.

**133.** "No series type of program with interconnected plot or substantially the same cast of principal characters shall be broadcast." *Id.* at 598.

**134.** *See* JA 383, 555–562.

of feature films is clearly reasonable. We also agree with the Commission that no purpose would be served by restricting subscription exhibition of films which could not be siphoned because they were under contract to a broadcaster. Finally, we do not think it unreasonable for the Commission to categorize other films unsuitable for broadcasting through its foreign language and after-ten-years rules. Even a challenger of these rules, Metromedia, could only demonstrate that 23 percent of older films were suitable for broadcasting.[135] Because the films to be protected constitute only a small fraction of the total available pool, a blanket prohibition of subscription use of these films would raise serious questions of overbreadth. Finally, we are unwilling to review line-drawing performed by the Commission unless a petitioner can demonstrate that lines drawn, for example the ten-year age, are patently unreasonable, having no relationship to the underlying regulatory problem.

We also affirm the Commission's deletion of the series programming rule. The Commission's discussion in its *Second Report and Order,* —— FCC 2d ——, 35 P & F Radio Reg.2d 767 (1975), JA 131, concludes that conditions now existing in the program production industry are adequate to supply series programming for both cable and conventional broadcast use, a conclusion which we agree is amply supported by public comments.[136] Further, as we indicated in discussing the pay cable rules, the series restrictions reflect a policy completely opposed to that adopted contemporaneously in the Prime Time Access Rules proceedings and consequently could not have been affirmed without a more detailed explanation than the Commission has so far proffered.[137]

Although the public record amply supports the subscription broadcast television rule amendments, these amendments cannot be finally approved until this court has had the benefit of the further proceedings set out in Part IV *supra.* Nonetheless, as we have said in Part IV, it seems unlikely that *ex parte* information will require vacation of the subscription broadcast television amendments, and we therefore hold that the amendments may remain in effect pending our final order in this segment of the case.

## VI. CONCLUSION

Our resolution of the various issues discussed in Parts I through V of this opinion require the following dispositions:

(1) The regulations adopted in the *First Report and Order,* 52 FCC 2d 1 (1975), and the regulations adopted in the *Memorandum Opinion and Order,* 23 FCC 2d 825 (1970), are set aside insofar as they apply to cable television.[138]

(2) The regulations adopted in the *Memorandum Opinion and Order,* 54 FCC 2d 797 (1975), are set aside.

(3) The repeal of regulations announced in the *Second Report and Order,* —— FCC 2d ——, 35 P & F Radio Reg.2d 767 (1975), is affirmed in all respects.

(4) The petitions for review of the Commission's refusal to waive its pay cable feature film rules, announced in *In re Home Box Office, Inc.,* 51 FCC 2d 317 (1975), are dismissed as moot.

(5) The rules adopted in the *First Report and Order, supra,* are affirmed insofar as they apply to subscription broadcast television subject to the further proceedings ordered in Part IV *supra.*

(6) The Commission is hereby ordered to undertake the additional proceedings set out in Part IV *supra.*

(7) The Commission is hereby further ordered to terminate its proceedings in Docket 20402 (concerning program exclusivity)

---

**135.** *See First Report and Order, supra* note 2, 52 FCC 2d at 12, JA 36.

**136.** *See, e. g.,* Joint Comments of Columbia Pictures Industries, Inc., *et al.,* in Docket 19554, at 3–6 (May 23, 1975), JA 890–893; Transcript

of Oral Argument before the Commission in Docket 19554, JA 1184–1187.

**137.** *See also* note 5 *supra.*

**138.** *See* note 27 *supra.*

within 180 days of the issuance of this order.[139]

*So ordered.*

WEIGEL, District Judge, concurring:

In joining the court's opinion, I wish to emphasize the view that the Federal Communications Commission lacks the power to control the content of programs originating in the studios of cablecasters. Such programs involve neither retransmission of signals received over the air from conventional television broadcasting nor transmission over television broadcasting frequencies. They are offered to users of television sets on terms the users are free to accept or reject.

It seems to me that if there could be any governmental interest justifying this species of censorship, it is an interest which Congress has not empowered the Commission to assert. In relation to cablecasting, the power is so fraught with the potential for impingement upon First Amendment rights that it should not be sanctioned by implication.

The holdings in *United States v. Southwestern Cable Co.*, 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968), *United States v. Midwest Video Corp.*, 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972), and other cases in their line, when read and measured on the particular facts in each, seem to me to be consistent with the views here expressed.

Mr. Chief Justice Burger, concurring in the result in *Midwest*, upheld Commission action regulating CATV systems which made extensive use of television broadcasting signals. In his opinion, after noting that that "case present[ed] questions of extraordinary difficulty and sensitivity in the communications field" (406 U.S. at 675, 92 S.Ct. at 1874), the Chief Justice declared his view that the Commission's position strained "the outer limits of even the open-ended and pervasive jurisdiction that has evolved by decisions of the Commission and the courts." (*Id.* at 676, 92 S.Ct. at 1874.) In my view, Commission control of program content of cablecasting goes well beyond those outer limits.

Opinion Concurring Specially filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge, concurring specially:

Belatedly, I file the following special concurrence.

This particular rulemaking proceeding began with a number of petitions by broadcast interests for reconsideration of earlier Docket orders and requested that certain existing rules of a highly restrictive nature be applied to all cablecasting programming. The Commission responded with:

> *Notice of Proposed Rule Making in Docket 19554* is hereby announced. All interested persons are invited to file written comments on the rule making proposals on or before September 15, 1972 and reply comment on or before September 29, 1972. . . . In reaching a decision in this matter, the Commission may take into account any other relevant information before it, in addition to the comments invited by this *Notice*.

35 FCC 2d 899, J.A. 7. This notice, including the provision that "the Commission may take into account any other relevant information . . . in addition to the written comments," constituted the initiation of what has come to be known as informal rulemaking, under 5 U.S.C. § 553(b).[1] Un-

---

139. *See* note 4 *supra.*

1. 5 U.S.C. § 553(b) (1970) provides:

General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not apply—

der *informal* rulemaking, the Commission would not be required to comply with the procedural requirements of sections 556 and 557, which, according to the provisions of section 553(b) and (c), apply to situations where rules are required by statute to be made on the record, after opportunity for an agency hearing. The latter category of agency action refers to *formal* rulemaking, and also pertains to adjudication required by statute to be determined on the record after opportunity for an agency hearing (*see* section 554(b)).

Recently, in *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), a case dealing with informal rulemaking, the Supreme Court held that where there was a statutory requirement that certain findings precede administrative action and the specific findings had not been made, "the full administrative record that was before the Secretary at the time he made his decision," 401 U.S. at 420, 91 S.Ct. at 824, had to be made available to the reviewing court.

To the extent that our *Per Curiam* opinion relies upon *Overton Park* to support its decision as to *ex parte* communications in this case, it is my view that it is exceeding the authority it cites because here there is no statutory requirement for specific findings nor are the regulations limited to the full administrative record. And our opinion follows up this excessive reliance on *Overton Park* by an overly broad statement of the rule. I refer particularly to the following:

> Once a notice of proposed rulemaking has been issued, however, any agency official

or employee who is or may reasonably be expected to be involved in the decisional process of the rulemaking proceeding, should "refus[e] to discuss matters relating to the disposition of a [rulemaking proceeding] with any interested private party, or an attorney or agent for any such party, prior to. the [agency's] decision * * *," Executive Order 11920, § 4, *supra,* at 1041. If *ex parte* contacts nonetheless occur, we think that any written document or a summary of any oral communication must be placed in the public file established for each rulemaking docket immediately after the communication is received so that interested parties may comment thereon.

185 U.S.App.D.C. at ——, 567 F.2d at 57. I agree that this is the proper rule to apply in this case because the rulemaking undeniably involved competitive interests of great monetary value and conferred preferential advantages on vast segments of the broadcast industry to the detriment of other competing business interests. The rule as issued was in effect an adjudication of the respective rights of the parties vis-a-vis each other. And since that is the nature of the case and controversy that we are deciding and to which our opinion is limited, I would make it clear that that is all we are deciding. I would not make an excessively broad statement to include *dictum* that could be interpreted to cover the entire universe of informal rulemaking. There are so many situations where the application of such a broad rule would be inappropriate that we should not paint with such a broad brush.[2] In addition section 555(b), which applies to the entire act, authorizes

---

> (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or
> (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

**2.** Professor Kenneth Culp Davis in his *Administrative Law Treatise* (1958) points out some of the advantages of informal rulemaking and its wide scope:

§ 6.02. Written Presentations, Consultations, and Conferences

Informal written or oral consultation with affected parties or with advisory committees *is the mainstay of rule-making procedure.* The principal requirement of the APA is "opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity to present the same orally in any manner." The Model State Act calls for "opportunity to submit data or views orally or in writing."

The consultative process may take many forms. The administrator or staff member may talk over possible rules with selected

interested parties to confer with all responsible employees of any agency:

. . . So far as the orderly conduct of public business permits, an interested person may appear before an agency or its responsible employees for the presentation, adjustment, or determination of an issue, request, or controversy in a pro-

ceeding, whether interlocutory, summary, or otherwise, or in connection with any agency function. . . .

5 U.S.C. § 555(b). Specifically, I would restate the opening clauses of the above quoted provision of our opinion to restrict it to the facts of the case before us, *i. e.*, to read substantially as follows:

parties, by telephone or in person, singly or in groups, by systematically and formally arranged conferences or interviews or in connection with fortuitous contacts occasioned by other business. To frame one set of rules the ICC once conducted 89 informal conferences attended by 1,740 individuals representing 1,286 carriers; to frame another set the Commission sent an interviewer through fifteen states to talk with representatives of motor carriers, members of state commissions, executives of insurance companies, and insurance agents and brokers, and then later conferences were held with committees representing the bus industry, the truck industry, and insurance associations. Sometimes consultation involves collaboration in planning and drafting, as when technical representatives of shipping companies cooperate with technicians of the Customs Bureau in preparing rules concerning construction of vessels. The Emergency Price Control Act provided that "before issuing any regulation or order . . . the Administrator shall, so far as practicable, advise and consult with the representative members of the industry. . . ."
When parties are too numerous and individuals may not be representative, some organization often supplies what is needed. For instance, in the FCC "regular contacts are maintained with well-established trade associations and some licensees and carriers. If a matter involving an aviation radio problem is under consideration, for example, the Commission employee invariably communicates with a representative of Aeronautical Radio, Inc., a non-profit cooperative association whose members are the leading air transportation lines. Whenever the Commission is considering the promulgation of regulations dealing with common carriers, it always attempts to obtain the cooperation of State regulatory bodies and the National Association of Railroad and Utilities Commissioners . . . in most circumstances the Amateur Radio Relay League and the National Association of Broadcasters can effectively represent their membership." The Attorney General's Committee admiringly described the rule-making methods of the Board of Governors of the Federal Reserve System: "The practice of the Board . . . is especially noteworthy because of the Board's vir-

tually complete reliance upon conferences rather than hearings as a means of enabling affected parties to participate in the rule-making process. Over a period of time the Federal Reserve System has developed a procedure of consultation and conference. . . . Outside views come from replies to letters which the Board sends out, and orally at conferences. Usually statements are put in writing and a stenographic report of conferences is made. Frequently, the interchange *of data and views is facilitated by mimeographing them, both within and without the staff.* The procedure is flexible, thorough, adapted to bringing the knowledge of an expert agency to bear upon its rule-making problems, and fair. . . ."
The Attorney General's Committee generalized concerning conferences: "The practice of holding conferences of interested parties in connection with rule-making introduces an element of give-and-take on the part of those present and affords an assurance to those in attendance that their evidence and points of view are known and will be considered. As a procedure for permitting private interests to participate in the rule-making process it is as definite and may be as adequate as a formal hearing. If the interested parties are sufficiently known and are not too numerous or too hostile to discuss the problems presented conferences have evident advantages over hearings in the development of knowledge and understanding."
The superiority of the conference over the hearing has been convincingly described by a commentator: "Let it not be assumed too easily that hearings are a significant protection *against bureaucratic absolutism.* To a slothful administrator a hearing precedent to regulation may be a God-given opportunity to avoid work and thought. He need only listen with impassively judicial countenance and then forget all he has heard. It is the conference with its give and take ideas and information, with its possibilities of detailed exploration of minor points and hidden corners which stirs the mind to action. Moreover, there are demonstrably situations where hearings produce little if anything of value."
1 K. Davis, Administrative Law Treatise § 6.02, pp. 363–365 (1958) (footnotes omitted).

Once a notice of proposed rulemaking has been issued that will involve competing private claims to a valuable privilege [3] or selective treatment of competing business interests of great monetary value . . etc.

There are several other statements in this section of our opinion which are too broad and should be similarly limited to the precise type of case currently before us.

---

3. *See Sangamon Valley Television Corp. v. United States*, 106 U.S.App.D.C. 30, 43, 269 F.2d 211, 224 (1959).